# J. M. Bilton v. Territory.

No. 2156, Okla. T. Opinion Filed January 13, 1909.

(99 Pac. 163.)

1.     **TRIAL—Separation of Jury.** Section 5519, Wilson's Rev. & Ann. St. 1903, requires that when the case is finally submitted to the jury, one or more officers must be sworn to keep them together until they have agreed upon a verdict and to return them into court when they have so agreed, or when ordered by the court. Held, that this section imperatively requires that upon the final submission of the case to the jury, they cannot be permitted to separate, and if permitted to separate, such separation vitiates the verdict, notwithstanding no affirmative evidence of prejudice is offered.

2.     **NEW TRIAL—Misconduct of Juror—Use of Liquors.** The use of intoxicating liquor as a beverage by a juror during the trial and consideration of a capital case will vitiate a verdict of guilty, and entitle the accused to a new trial.

3.     **HOMICIDE—"Dying Declarations"—Condition of Declarant.** In order to render dying declarations admissible, it must be shown that the declarant was not only in articulo mortis, but under the sense of impending death, without hope of recovery, at the time such declarations were made.

4.     **SAME—Sense of Impending Death.** Contradictory statements as to expectations of impending death may prevent the admission of a statement as a dying declaration.

5.     **CRIMINAL LAW—Appeal—Estoppel to Allege Error—Invited Error.** The accused will not be heard to complain that evidence offered in support of a dying declaration was heard by the court in the absence of the jury, when such absence was requested by the accused.

6.     **HOMICIDE—Dying Declarations — Admissibility — Presumptions.** The court in a prosecution for homicide, in which dying declarations are sought to be introduced in evidence, will not presume in the absence of evidence that a man who has been injured, though seriously, must necessarily feel that he is about to die, and on such presumption admit his declaration.

7.     **SAME—Sense of Impending Death.** It is error for the trial court to admit in evidence as a dying declaration a paper writing in the following words and figures: "Mr. P. A. Cox came from Cornish about 8 o'clock p. m. Saturday the 17th of June, 1905, walked out in front of the hotel and was talking to Miss Emma Martin, and telling her he was tired of this, and asked her to tell D. S. Huffman he wanted to drop this; about this time J. M. Bilton stepped out of his place of business and said he was tired of it too, and called him a son of a bitch, raised his sixshooter and fired, the ball striking me in the breast. I had no gun at all. I made no attempt to hurt him at all, but told him to go away and let me alone. I am of the opinion

I am not going to get well"—unless competent evidence independent of such declaration is offered in support thereof, showing that at the time said declaration was made the declarant had given up all hope of recovery.

8. SAME — Admissibility — Credibility. When dying declarations are offered in evidence, it becomes the duty of the trial court to first determine whether the declarant was in extremis, and whether he had lost all hope of recovery at the time the declaration was made; and, if such declaration is admitted as competent, it is then for the jury to pass upon its credibility.

9. TRIAL—Instructions—Evidence "Evenly Balanced." The accused in a murder case having put in evidence his general reputation as a peaceable, law-abiding citizen in the community where he resides, it is error for the trial court to instruct the jury that, if the evidence independent of the testimony in reference to character is found to be evenly balanced, then evidence of character would be sufficient to turn the scale in favor of the accused.

10. CRIMINAL LAW—Evidence—Sufficiency. In a criminal case, if the evidence is equally balanced, the accused is entitled to a verdict of acquittal.

11. TRIAL—Argument of Counsel. The trial court ought to confine counsel strictly within the facts of the case, and, if counsel persistently go outside of the record in their argument or statements to the jury, then the court should punish them; and, if they should obtain their verdict by this means, then the court should set such verdict aside.

12. CRIMINAL LAW—Appeal—Presentation and Reservation of Grounds of Review—Objections—Argument of Counsel. When the prosecuting attorney goes outside of the record and makes improper remarks, calculated to prejudice the rights of the accused, it is the duty of counsel of the accused to promptly interpose an objection to such remarks, and move the court to withdraw them from the consideration of the jury and instruct the jury not to consider such remarks. In this case, if this court believes that the remarks of the county attorney complained of materially aided in bringing about the verdict, we will set the verdict aside on account of such remarks.
(Syllabus by the Court.)

*Error from District Court, Comanche County, Oklahoma Territory; F. E. Gillette, Judge.*

J. M. Bilton was convicted of manslaughter in the first degree, and he brings error. Reversed.

On the 12th day of March, 1906, during the regular term of the district court of the county of Comanche, territory of Oklahoma, the grand jury duly found and returned into said

court an indictment against J. M. Bilton, charging that on the 17th day of June, 1905, the said Bilton did kill and murder one P. A. Cox. The accused was arrested, arraigned, and pleaded not guilty. On the 23d day of October, 1906, he was put on his trial on said indictment, which resulted in his conviction of manslaughter in the first degree, and was, by said court, duly sentenced to serve a term of 10 years in the territorial prison at Lansing, Kan. It is from this verdict, and the judgment of the court thereon and the action of said court in refusing a new trial, that the accused appeals this case to this court.

*Hudson & Key, Bridges & Vertrees,* and *Stillwell H. Russell,* for plaintiff in error.—

On question of separation of jury: *State v. Nelson,* (Kan.) 70 Pac. 633; *McLain v. State,* 10 Yerger, 241, 31 Am. Dec. 573; *Commonwealth v. McCall,* 1 Va. Cas. 271; *Nomague v. People,* 12 Am. Dec. 157; *Peiffer v. Commonwealth,* 15 Pa. St. 468 ,53 Am. Dec. 605.

On question of jury's use of intoxicating liquor: *State v. Bullard,* 16 N. H. 139; *State v. Baldy,* 17 Iowa, 39; *People v. Douglass,* 4 Cowen 26, 15 Am. Dec. 332; *Jones v. State,* 13 Tex. 168; *Telham v. Page,* 6 Ark. 535; *Gregg v. McDaniel,* 4 Harr. (Del.) 367; *People v. Gray,* 61 Cal. 164; Proffatt on Jury Trial, 398.

On admissibility of dying declaration: Wharton on Homicide, p. 1003; *Whitaker v. State,* 79 Ga. p. 87, 3 S. E. 403; *Titus v. State,* 117 Ala. 16, 23 So. 77; *Smith v. Com.* 113 Ky. 19, 67 S. W. 32. 40 Am. St. Rp. 405; 2 Russ. Cr. 753; 1 Greenl. Ev., Sec. 123; 1 Phil. Ev. 289; *People v. Robinson,* 2 Park. Crim. Rep. 246; *Robbins v. State,.* 8 Ohio St. 131, *Smith v. State,* 9 Humph, 9; *Woodcock's Case,* 1 Leach, 503; *People v. Hodgdon,* 55 Cal. 72, 36 Am. Rep. 30.

*W. O. Cromwell, Thomas R Clift, Charles West,* Atty. Gen., and *W. C. Reeves,* Asst. Atty. Gen., for the Territory.—

On separation of the jury: Thompson & Merriam on Juries, page 370; *State v. Cucuel,* 31 N. J. L. 249; *State v. Bell,* 70 Mo. 633; *Crockett v. State,* 52 Wis. 211; *State v. Bowman,* 45 Iowa,

418; *State v. Conway,* 23 Minn. 291; *People v. Bonney,* 19 Cal. 426; *Marzen v. People,* 190 Ill. 81; *State v. Williams,* 149 Mo. 496; *Payne v. State,* 66 Ark. 545.

On use of intoxicants by jury.: Thompson & Merriam on Juries, page 458; *Wood v. State,* 34 Ark. 341; *Pratt v. State,* 56 Ind. 179; *Davis v. People,* 19 Ill. 74; *Roman v. State,* 41 Wis. 312; *State v. West,* 69 Mo. 401; *Russell v. State,* 53 Wis. 367; *People v. Bemmerly,* 98 Cal. 299; *People v. Leary,* 105 Cal. 386; *Larimer v. Kelley,* 13 Kan. 78; *People v. Saisome,* 98 Cal. 235; *State v. Tatlow,* 23 Kan. 80; *Perry v. Barley,* 12 Kan. 537:

On admissibility of dying declaration: Wharton on Homicide, p. 1000; *Mattox v. U. S.* 146 U. S. 140; *People v. Dobbins,* 138 Cal. 694; *People v. Lem Deo,* 132 Cal. 199; *State v. Aldrich,* 50 Kan. 666; *State v. Furney,* 41 Kan. 115; *Archibald v. State,* 122 Ind. 122; *People v. Vernon,* 35 Cal. 49; *Hammil v. State,* 90 Ala. 576; *State v. Wilson,* 121 Mo. 434; *State v. Walton,* 92 Iowa, 455; *Stark v. State,* 137 Ala. 9; *Commonwealth v. Thompson,* 159 Mass. 56; *Newberry v. State,* 68 Ark. 355; *State v. Ah Lee,* 7 Or. 237.

BAKER, JUDGE (after stating the facts as above). The errors complained of by the accused, as shown by his petition in error herein, are as follows:

(1) Said court erred in overruling the motion of the accused for a new trial.

(2) Said court erred in overruling the motion of the accused for a new trial on the grounds of newly discovered evidence.

(3) Said court erred in admitting evidence offered on the part of the territory of Oklahoma.

(4) Said court erred in refusing and ruling out competent and legal evidence offered on the part of the accused.

(5) Said court misdirected the jury in matters of law.

(6) Said court erred in the decisions of questions of law arising during the course of the trial.

(7)   Said court erred in admitting in evidence the purported "dying declaration" of the deceased, P. A. Cox.

(8)   Said court erred in giving general instructions numbered 3, 11, 14, 18, 20, 24, and 27.

(9)   Said court erred in refusing to give special instructions requested by accused, numbered 1, 2, 3, 4, 5, 6. 7, 8, 9, 10, 10½, 11. 12, 13, and 14.

(10)   Said court erred in granting a continuance to the territory of Oklahoma.

(11)   Said court erred in not withdrawing from the jury certain statements made by the county attorney.

(12)   Said court committed other errors appearing in the record to the prejudice of the substantial rights of the accused.

Elaborate well-prepared briefs were filed on both sides, citing more than 200 cases, all of which were duly examined and carefully read by this court.

The first assignment of error, being predicated upon the overruling of the motion for a new trial, necessarily involves a consideration of all the grounds urged by the accused for a new trial in the court below. The motion for a new trial sets up, in substance, that the jury separated without leave of the court after retiring to deliberate on their verdict and before delivering the same into open court; that the jury was guilty of misconduct, by which a fair and due consideration of this case was prevented. From an examination of the evidence in support of the first and second grounds alleged for a new trial we find the affidavits of R. E. Dishman, T. A. Lewis, Alvin Campbell, and the accused. The substance of these affidavits is that, at different times during the introduction of testimony and the consideration of their verdict the jury was permitted without leave of the court to intermingle with the guests of the hotel at which the jury was being entertained, unattended at times by a sworn officer or bailiff, and at such times were in a position to hear any comments or statements that might have been made by other guests at said hotel; that the jury in a body, accompanied by a sworn

officer, attended a public entertainment at the opera house, and were guilty of misconduct prejudicial to the rights of the accused by drinking whiskey in the washroom at the hotel and in a certain saloon. Eleven of the jurors who sat in this case were called by the territory, and they each testified upon the hearing of the motion for a new trial; the substance of their testimony being that the Juror Horton left the other jurors, unattended by a sworn officer, and went alone to a closet in the rear of the lot upon which the hotel at which the jury in this case were being entertained was located; that on their way from the hotel to the courthouse Jurors Thompson and Curtis left the remainder of the panel on the street and went into a saloon and drank whiskey; that Juror Nelson went to his office for his mail, but while doing so was near the bailiff in charge of said jury. The testimony of the jurors also shows that from necessity the jury was obliged to mingle to some extent promiscuously with the guests and frequenters of the hotel where said jury ate and slept, by reason of the smallness of the lobby, washroom and dining room of said hotel; also, that they sat about the stove in the lobby of said hotel, and intermingled with guests and others. The undisputed testimony shows that some three or four of the jurors drank whiskey out of a bottle in the washroom at the hotel, and two drank whiskey at a saloon during the time they were hearing this case and deliberating upon their verdict; also, that the jury attended a public entertainment at the opera house in a body, attended by a sworn officer.

The question, therefore, arises: Was the conduct of the jury such as to vitiate its verdict?

In an early and very instructive case upon this subject found in *Commonwealth v. John McCaul*, 1 Va. Cas. 271, McCaul was indicted on the charge of larceny. The evidence in said case shows that a juror separated from the jury against the wishes of the officer in charge, went to his hotel, ate his dinner, and, returning, resumed his place in the jury box, and another juror visited his sick child, the officer of the court accompanying remaining at the foot of the stairs, while the juror went up stairs

to see his sick child and family. The trial resulted in a verdict of guilty. McCaul prosecuted error on the sole ground of the separation of the said jurors. Neither of the said jurors were separated more than 20 minutes. No evidence was offered to show that any one had talked to or attempted to tamper with or influence said jurors. The jurors themselves filed affidavits in which they stated that they had not talked with any one concerning the case on trial, and did not hear the case mentioned in any way. The "general court of Virginia" in this case held that notwithstanding the evidence conclusively showed that the jurors had not in any manner been tampered with, or influenced against the accused in this case, but by reason of their separation from the jury, said court held that it was harmful and prejudicial error, and a new trial was ordered.

It is not the opinion of the court in the case at bar that the jurors were tampered with, influenced, or prejudiced against the accused; but in our opinion it is an abuse of the discretion of the trial court in a capital case to permit the jury to be separated after they had been sworn to try the case, unless such separation is necessary and expressly permitted by the trial court. In any criminal case it is error to permit the jury to separate after the case has been submitted to them, and before they have reached a verdict. The object intended to be gained by preventing the separation of the jury is to safeguard in every possible way the purity of the stream of justice; to prevent it from in any manner being polluted by influences other than those which are produced by the legal evidence and the law governing the case. Such a course is both a protection to the interests of the state in bringing to justice one who may have committed a crime and safeguards the rights of the accused on trial for his life. It will be conceded by all interested in the administration of justice that one accused of crime is to be convicted or acquitted only upon the evidence given in his presence; that the minds of those who are to decide questions involving life and liberty are free from prejudgment; that in the course of the

trial no impression ought to operate on their minds, except that which is derived from the testimony presented to them in open court and the law as given them in charge by the court; that the minds of the jurors shall be free from prejudice and bias, either for or against the prosecution or the accused before the trial begins, and shall continue impartial until they have delivered themselves of their verdict. This can be guarded only by preventing the separation of the jury, and the prudence and care of the trial court and the officers thereof. Such a course of procedure will free the minds of the public as well as the parties directly interested in the trial of the case from the slightest suspicion that the stream of justice is not in all respects pure and free from contamination. Absolute impartiality and fairness in the trial of criminal cases should be desired by all concerned. Preventing thte separation of the jury offers the best means to prevent undue and unlawful influences. To keep the jury from separating may at times be difficult of accomplishment, but the trial court should make proper provision therefor, and the rule against the separation of jurors in capital cases should in no manner be relaxed. We find some conflict in the decisions upon this subject. Many able courts differ with us. On the other hand, we find many well-considered cases supporting the rule herein laid down.

The Supreme Court of Tennessee in the case of *McLain v. State,* 10 Yerg. 241, 31 Am. Dec. 573, holds:

"Separation of the jury on trial of a criminal case, caused by absenting themselves of some of the jurors from the remainder of the jury, after it had retired from court for the night, for the space of fifteen or twenty minutes, without their being in charge of an officer, will vitiate the verdict of conviction in the case and entitle the prisoner to a new trial without its being required of him to show in addition to these facts that the jurors were, after their separation, tampered with."

The Pennsylvania Supreme Court in the case of *Peiffer v. Commonwealth,* 15 Pa. 468, 53 Am. Dec. 605, holds:

"Separation of a jury in a capital case before they have been discharged is of substantial purport, and the disobedience

thereof will invalidate the verdict. Separation of the jury on an indictment for murder after they have been impaneled and sworn, although with defendant's consent, invalidates their verdict, and the prisoner will be held to answer another indictment."

*State v. Sherbourne,* Dud. (Ga.) 28, and numerous cases therein cited; *Nomaque v. People,* Breese (Ill.) 145, 12 Am. Dec. 157; *People v. Douglass,* 4 Cow. (N. Y.) 26, 15 Am. Dec. 332; *State v. Baldy,* 17 Iowa, 39; *State v. Nelson,* 65 Kan. 689, 70 Pac. 633; *State v. Prescott,* 7 N. H. 287; *Williams v. State,* 45 Ala. 57; *Jumpertz v. People,* 21 Ill. 375; *People v. Thornton,* 74 Cal. 482, 16 Pac. 244. Most of the cases cited by the territory in this case on this subject hold that the separation of a jury for a short time will not vitiate a verdict, where the juror so separated from the others is attended by a sworn officer, and where the facts show affirmatively that no improper influence upon the minds of the jurors has taken place; but the great weight of authorities in capital cases favor the doctrine that, if the jury separates without being attended by a sworn officer such separation vitiates the verdict, notwithstanding no affirmative evidence of improper influence has been adduced. The mischief is found in the danger that might result from separation, and the great trouble in being able to prove the improper influence which might result from improper separation. The juror who was influenced will be loath to admit it, and those guilty of producing such influence will deny their guilt; and the accused is therefore left without a remedy to free himself from the results of an improper verdict.

This brings us to the remaining question affecting the conduct of the jury in this case, which is based upon the charge that some of the jurors during the trial drank intoxicating liquor. The evidence with respect to this charge is conclusive. Eleven of the jurors were called as witnesses on this subject. Seven of them testified that whiskey was drunk by some of the jurors from a bottle and at a saloon; and their evidence is uncontradicted. The higher courts have often been appealed to in cases

involving this question; and while there is conflict of opinion, and the decisions quite equally divided, we think this is a propei time and a proper case in which to reflect the opinion of this court on this question. And, while we do not say the evidence in this case shows that a sufficient amount of liquor was drunk to affect the minds of any one of the jurors, we desire to express our disapproval of jurors drinking intoxicating liquor during the trial of a capital case. Every court, especially in the trial of a capital offense, should inquire whether, in the conduct of the jury, that prudence and circumspection has been observed which becomes them on such solemn occasion as that which commits to their hands the life of a fellow creature. We believe it will not be contended that the use of intoxicants by the jury during the performance of their duty will aid them in bringing about the furtherance of justice. No good results can be claimed for it, but much harm may result. It is the duty of thte trial court in the interest of the purity of its verdicts, and the rights of both the state and the accused, to have each verdict freed from any influence or consideration other than the evidence and the law; and juries or jurors should not be permitted while considering a criminal case to drink intoxicating liquors as a beverage, and, when the testimony shows that liquor was used as a beverage by the jury during its consideration of a capital case, such conduct of the jury should vitiate the verdict and entitle the accused to a new trial, regardless of affirmative proof of the effect the intoxicants had upon the mind of the juror.

The Supreme Court of Texas in *Jones v State,* 13 Tex. 168, 62 Am. Dec. 550, in an opinion handed down by Judge Lipscomb, says:

"The drinking of ardent spirits [whiskey] of their own procurement after they had retired to consider of their verdict vitiates their verdict, and is good cause for a new trial."

The Supreme Court of New Hampshire in the case of *State v Bullard,* 16 N. H. 139, says:

"If in the trial of a criminal case spirits be furnished any of

the jurors while deliberating on the verdict, such verdict, if against the prisoner, will be set aside."

The same court in the case of *Leighton v. Sargent,* 31 N. H. 119, 64 Am. Dec. 323, says:

"The use of brandy as a beverage by jurors while in the jury room after retiring to make up their verdict will furnish a sufficient cause for setting aside the verdict and granting a new trial, although the quantity drunk be small, and no suspicions are entertained by other jurors that the jurors who partook of it are under any influence from spirituous, liquors, and the liquor is furnished by the attending officer at the request of a juror complaining of illness."

In the *State of Iowa v. Baldy,* 17 Iowa, 39, the court says:

"When a juror after retiring to consider upon the verdict left the jury room in charge of the sheriff, and went to a grocery store where he procured and drunk a glass of ale or lager beer; after which he returned to the jury room and participated in finding the verdict, held, that the misconduct of the juror constituted sufficient ground to set the verdict aside and grant a new trial."

In the case of *People v. Douglass, supra,* Judge Woodworth, speaking for a majority of the court, said: "The mere drinking of spirituous liquors by the jurors is enough to set aside the verdict." *People v. Gray,* 61 Cal. 164, 44 Am. Rep. 549. The Supreme Court of Delaware in *Gregg v. McDaniel,* 4 Har. 367, a civil case, on motion after argument, set the verdict aside and granted a new trial on the ground that intoxicating liquor had been introduced into the jury room and used· pending their deliberations, citing a number of cases.

The next assignment of error grows out of the admission in evidence of the alleged "dying declaration" of P. A. Cox, for the slaying of whom the accused is on trial, which is in the following words:

"Mr. P. A. Cox came from Cornish about 8 o'clock p. m. Saturday the 17th of June, 1905, walked out in front of the hotel and was talking to Miss Emma Martin, and telling her he was tired of this, and asked her to tell D. S. Huffman he wanted to drop this; and about this time J. M. Bilton stepped out of his place

of business and said he was tired of it too, and called him a 'damn son of bitch,' raised his six-shooter and fired, the ball striking me in the breast. I had no gun at all. I made no attempt to hurt him at all, but told him to go away and let me alone. I am of the opinion I am not going to get well. T. R. Martin, Miss Emma Martin, Ernest Lester, Bill Morris, and W. C. Haywood were sitting in front of the hotel. P. A. Cox. Witnesses: T. R. Martin. J. W. Horn."

It will be observed by the reading of the paper writing offered as a "dying declaration" in this case that the declarant states: "I am of the opinion I am not going to get well." We are therefore led to inquire what is, in this connection, meant by the word "opinion." Sir Mathew Hale's definition of the word is:

"Opinion is when the assent of the understanding is so tai gained by the evidence of probability that it rather inclines to one persuasion than to another, yet not without a mixture of uncertainty or do ibt."

The evidence offered in support of the dying declaration herein does not show that the declarant intended to give the word "opinion," as used by him in this connection, a meaning different from that ordinarily given and understood. Hence the use of the word "opinion," as used in said dying declaration, is expressive of uncertainty and doubt, and produces in our minds the conviction that the declarant had not lost all hope of recovery. At the request of the accused, the court heard the testimony in support of the admissibility of the above quoted writing in the absence of the jury. To the admission of said paper as a "dying declaration" the accused excepted, and urges that the court erred in admitting the same. The question, therefore, presents itself to this court: Was the paper above quoted a "dying declaration"?

Wigmore, in his excellent work on Evidence (section 1438) ; says:

"All courts have agreed, with more or less difference of language, that the approach of death produces a state of mind in which the utterances of the dying person are to be taken as freed from all ordinary motives to misstate. The great dramatist expressed the common feeling long before it was sanctioned

by judicial opinion.   In the following passages will be found the now classical sentences of the earlier English judges, as well as the later ones pointing out clearly how the situation supplies a circumstantial guarantee of accuracy equivalent to that of the tests of oath and cross-examination."

The admissibility of dying declarations is based entirely upon the fact that they are made *in extremis,* when the person making them is at the point of death, and when every hope of this world is gone, when every motive of falsehood is silenced, and the mind  is induced by the most powerful considerations to speak the truth.   A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is created by a positive oath administered in a court of justice. In other words, when the person making the declaration has lost all hope of recovery, he is in the same practical state as if called on in the court of justice under sanction of an oath, and his declarations as to the cause of his death are considered equal to an oath.

Judge Ray, in the case of *Morgan v. State,* 31 Ind. 199 (referring to dying declarations), says:

"As this class of evidence forms an exception to the general rule; as there can be no cross-examination of the declarant; as the accused cannot often meet his accuser face to face; and there must of necessity exist great danger of abuse—it must clearly appear that the statements offered in evidence have been made under a full realization that the solemn hour of death has come."

In other words, to render a dying declaration admissible in evidence, it must have been made when the declarant was not only *in extremis,* but also had abandoned all hope of living. It will be observed that in the declaration in this case the language is used: "I am of the opinion I am not going to get well." The paper in this case alleged to be a dying declaration, and admitted in evidence as such in the court below, on its face is not a dying declaration.   It appears from the declaration itself that the declarant had not abandoned all hope of recovery.   Therefore the court below erred in the admission of said declaration in evidence.   In this view we are supported by the well-established

rule. But, in looking into the record in this case, we find the testimony taken in support of the alleged dying declaration discloses the fact that the declarant had been told that the bullet which afterwards caused his death had, in fact, not penetrated his body; that he was not told by his physician and surgeon that he was about to die. On the contrary, after the alleged declaration was made, he sent to Comanche for additional medical aid; thus showing that he had hope of recovery, and was not in *articulo mortis*.

The following authorities clearly sustain our view: 1 Greenl. on Ev. § 123; 1 Phil. Ev. 289; 2 Wig. on Ev., commencing at section 1430 on page 1798, and subsequent sections; *People v. Robinson,* 2 Parker Cr. R. (N. Y.) 246; *Robbins v. State,* 8 Ohio St. 131; Whar. on Hom. 1003; *Whitaker v. State,* 79 Ga. 87, 3 S. E. 403; *Titus v. State,* 117 Ala. 16, 23 S. E. 77; *Smith v. Commonwealth,* 113 Ky. 19, 67 S. W. 32; *State v. Johnson,* 118 Mo. 491, 24 S. W. 229, 40 Am. St. Rep. 405; *State v. Medicott,* 9 Kan. 257; *State v. Knoll,* 69 Kan. 767, 77 Pac. 580; *State v. Draper,* 65 Mo. 335, 27 Am. Rep. 287; *Leiber v. Commonwealth,* 9 Bush (Ky.) 11; *Starr v. Commonwealth,* 97 Ky. 193, 30 S. W. 397; *State v. Shelton,* 47 N. C. 360, 64 Am. Dec. 587; *Nelson v. State,* 7 Humph, (Tenn.) 542; *Hackett v. People,* 54 Barb. (N. Y.) 370; *Reynolds v. State,* 68 Ala. 502; *State v. Baldwin,* 79 Iowa, 714, 45 N. W. 297; *Montgomery v. State,* 80 Ind. 338, 41 Am. Rep. 815; 10 A. & E. Enc. Law (2d Ed.) 376; *State v. Chambers,* 87 Mo. 406; *People v. Hodgdon,* 55 Cal. 72, 36 Am. Rep. 30.

The next assignment of error inviting our attention is the assignment predicated upon the court's refusal to grant a new trial on the grounds of newly discovered evidence. It appears from the record in this case that one J. W. Horn was a subscribing witness to the alleged "dying declaration." This fact was known to the accused before the trial. The accused by his counsel, as shown by the record, had called upon Horn several times, requesting him to make a statement to them concerning his knowledge of the physical condition of the declarant at the

time of the making of the alleged dying declaration, and statements, if any, made by declarant at the time, but that, by reason of his friendship for declarant, and hostility toward the accused, said Horn refused to make any statement on the subject until after the accused was convicted, and then, for the first time, he made to counsel of the accused statements in the form of an affidavit filed in support of said motion. In his affidavit Horn says, in substance: That the reason he did not disclose the evidence set out in his affidavit before the trial was, because the deceased was his close personal friend, and that he was unfriendly to the accused, but notwithstanding he was many times approached by the counsel for the accused, and asked to state all he knew about the "dying declaration" and statements made by the declarant at the time the same was made; that he had replied each time that he knew nothing; that he was present at the bedside of the deceased when there was reduced to writing a statement called the "dying declaration" of Cox, and which statement was used by the prosecution in the trial of this case; that he signed said statement as a witness; that at the time the statement was drawn, and at the time it was signed by Cox, and by affiant as a witness, Cox made the following statement:

"I do not believe that I am going to die. That 'son of a bitch' can't kill me, but I will sign anything that will help to break the 'son of a bitch's' neck in case I do die."

This affidavit stands in the record uncontradicted. The affidavits of counsel for the accused in support of the motion for a new trial on the grounds of newly discovered evidence show an unusual amount of diligence in attempting to secure the testimony of Horn at the trial of the accused; and show, further, that neither the accused nor his counsel knew of the facts set forth in Horn's affidavit until informed thereof by said Horn after the trial below. The newly discovered evidence is not cumulative; and, while it contradicts to some extent the alleged "dying declaration," it is in the opinion of this court very material, and might, if offered at the trial, have produced a different verdict.

Another assignment of error is predicated upon the charge of the court to the jury contained in instruction No. 27, at page 196 of the record, in which the court instructed the jury in the following words:

"The court instructs the jury that the defendant having put in evidence his general reputation as a peaceable, law abiding citizen in the community where he resides, such evidence is admissible under the law to be considered by the jury as a circumstance in this case, such evidence is permitted as bearing upon the question of defendant's guilt or innocence, upon the theory that a person who has heretofore always borne a good reputation as a peaceable citizen, and would not probably be guilty of the crime charged in the indictment herein. The court further instructs the jury that, if from all the evidence in this case they are satisfied beyond a reasonable doubt of the guilt of the defendant under the evidence and the instructions of the court, then it is your duty to find him guilty, notwithstanding the fact that heretofore, and at the time of the commission of the crime charged, the accused had borne a very good reputation as a peaceable citizen. If the evidence independent of the testimony in reference to good character is found to be evenly balanced, then the evidence of good character would be sufficient to turn the scale in his favor. The weight of such testimony, and the extent to which you will rely thereon, is a circumstance in this case, and what, if any, evidence in behalf of the prosecution is overcome thereby, is left wholly to your sound judgment in the consideration of all the evidence in the case."

This instruction was excepted to by the accused. The above quoted instruction is, in effect, this: That, if the jury found the evidence equally balanced, the defendant would not be entitled to a verdict of acquittal. This is not the law in criminal cases. If the evidence is equally balanced, the defendant as a matter of right is entitled to a verdict of acquittal, though his character and reputation may always have been as black as the hinges of Hades. The charge as given is clearly erroneous. We deem it unnecessary to cite authorities in support of our opinion respecting said charge.

Counsel for the accused in argument complained also that the court below heard the testimony offered in support of the

competency of the alleged "dying declaration" in the absence
of the jury, contending that the jury should have heard all the
evidence offered ·on the trial of this case.   The record, however,
discloses that· the accused requested that said evidence be taken
in the absence of the jury.   He therefore cannot now be heard
to complain.

The accused complains of the conduct of the county attorney
during the trial of this case in the court below, in this :   That
he made remarks prejudicial to the accused in both his opening
statement and closing argument to the jury, which were not sus-
tained by the record,   We have 1ead the record in this connec-
tion, and find that the remarks of the county attorney are clearly
outside of the record,· and should, therefore, not have · been
made.   We cannot see, however, that the remarks were preju-
dicial to the accused.   The trial court should have instructed
the jury to have disregarded said remarks, which he probably
would have done if he had been requested to do so by the ac-
cused.   The record shows no such request, but shows that the
accused objected and excepted to the same.   The county attorney
in the discharge of his duty should always be fair with the
accused.   No good purpose can be accomplished by any other
course.

This court in the case of *Buck v. Territory of Oklahoma,*
(decided at the present term of this court) *ante,* p.—, 98 Pac.
1017, held :

"When the prosecuting attorney goes, out of the record
and makes improper remarks, calculated to prejudice the rights
of the defendant, it is the duty of counsel for defense to promptly ·
interpose an objection to such remarks and move the court to
withdraw them from the consideration of the jury, and to instruct
the jury· not to consider such remarks.   It is too late to interpose
objections to improper remarks of the prosecuting attorney in
his argument to the jury, after the argument has closed, unless
the remarks were of such a character that their withdrawal
from the consideration of the jury would not cure the error com-
mitted in their utterance."

Also in the case of *Vickers v. United States,* 98 Pac. 467, this court held:

"Where the language used by the assistant United States attorney in his opening statement is calculated to prejudice the accused, and proper objection is made and overruled by the court, and exception taken, the question will be reviewed by this court, but not otherwise. Where the assistant United States attorney in his argument to the jury went outside of the record, and appealed to the passions and prejudices of the jury, and objection was made and overruled, the strength of the testimony against the defendant will be considered, and, if the improper statements may have determined the verdict, a new trial will be granted."

It is the opinion of this court that for the various errors found herein the judgment of the court below should be, and the same is hereby, reversed, the cause remanded, and a new trial ordered.

FURMAN, Presiding Judge, and DOYLE, Judge., concur.