Lorenzo Alphonso HAYES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A-12225.

Criminal Court of Appeals of Oklahoma.

Jan. 11, 1956.

---

. W. Leslie Webb, Elliott Howe and Frank Hickman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

This is a companion case to Fields v. State, Okl.Cr., 284 P.2d 442, decided by this court May 18, 1955. The plaintiff in error, Lorenzo Alphonso Hayes, hereinafter referred to as defendant, was jointly charged with Ernest Fields with the murder of Vol Dale Royster. A severance was granted, Fields was tried first, convicted and assessed the death penalty, but this court modified the sentence to life imprisonment. Herein the defendant was also convicted, was sentenced to life imprisonment, and the case is now here on appeal.

The record discloses that some time prior to the crime charged defendant was injured by a motor falling on him at a garage where he was working, and that he had suffered from headaches and fainting spells, so that on May 25, 1954 the court as a precautionary measure, and over the objection of counsel for the defendant, ordered defendant committed to the Taft State Hospital for mental observation. The case was continued from time to time, and then reset for trial for November 8, 1954. The trial actually commenced November 10, 1954 when the first witness testified. The case

was not completed until November 24, 1954, after several recesses. Presumably the report from the Taft State Hospital showed defendant not insane or suffering from a mental disorder. The record does not affirmatively show the medical findings.

As grounds for reversal it is urged in brief: First, insufficiency of the evidence; second, that the court erred in the admission and exclusion of evidence; and, third, that the court erred in permitting the jurors to separate prior to the submission of the case.

Considering the first proposition, the record in this case contains over 1200 pages; the companion case of Fields v. State, supra, was likewise voluminous. We have carefully read the record herein and the evidence in this case was mostly repetitious of prior testimony covering issues pertinent and common to both the Fields and Hayes cases, with discrepancies of State and defense witnesses about balanced. In the Fields case we detailed the evidence at length.

Appellant Hayes' defense was an alibi, and he produced additional and substantial evidence to show that he did not leave Tulsa the night of the homicide, and could not have been at the place where the body of Vol Dale Royster was found. On the other hand, there was substantial evidence on the part of the State showing that the defendant did leave Tulsa the night of December 12, 1953 and that he was in the vicinity where the body of the deceased was found in eastern Tulsa County. In fact, a former Tulsa County Attorney swore that when defendant was first brought in after his arrest he admitted to him that he was in that vicinity the night in question, but denied any knowledge of the murder.

The record conclusively shows that Vol Dale Royster worked at the McCoy Trailer System yard in Tulsa, and that on December 12, 1953 somewhere between 5:30 and 6:25 P.M. he was kidnapped, transported to the eastern edge of Tulsa County and killed by a .45 calibre bullet being fired through his brain from an Army automatic pistol, the property of the co-defendant Fields. The body was found in a dry creek bed just off

a small bridge where a road left the black-topped highway along the Tulsa-Waggoner County line, and went down into some farm land.

There were no eye witnesses to place defendant or his car at the scene where the body was found. The evidence was wholly circumstantial.

In addition to the credible testimony refuting defendant's claim that he did not leave Tulsa and drive with Ernest Fields to Coweta and Red Bird the night of December 12, 1953, was evidence of certain tire tracks tending strongly to connect defendant with the crime; also a wrench of peculiar type and identified as State's Exhibit 2 disappeared from the McCoy Trailer System place of business on the night of the kidnapping and murder, and was later found in the trunk of defendant's automobile. A similar wrench identified as State's Exhibit 3 also disappeared at the same time from the McCoy Trailer System, and was later found on defendant's work bench at the Williams Garage; and a Smith & Wesson .38 calibre revolver, admittedly the property of the defendant, was found under the seat of his automobile. The gun was fully loaded, except one shell had been fired. The defendant sought to explain this fact by stating that he had fired the gun once on New Years Eve. The evidence was that the deceased was shot twice. One shell from a .45 calibre automatic was found as was a .45 calibre bullet that had passed through the head of deceased and on through a crack, chipping the edge of oak planks of the bridge. The second wound was a superficial one in the left shoulder, but that bullet was never recovered, and in this trial the evidence did not show that it could be determined what may have been the calibre of the bullet inflicting that wound. It was the State's theory that this wound may have been inflicted by a bullet from the defendant's revolver, where the shell would not be ejected but would remain in the cylinder. Such was the basis for the admission in evidence of the revolver in question, although the defendant later did offer evidence to show that he was not in possession of the revolver on the night in question, but that it was at the home and in the possession of his step-father.

A large piece of cloth, part of a dress, was found in the front seat of defendant's automobile at the time of his arrest by deputy sheriff Louis Downing. The officer said that it was wadded up and in the middle of the front seat; that he asked the defendant where he got it, and "He said he picked it up somewhere, that he was a mechanic, and he used it to wipe his hands on." The piece of dress was admitted in evidence as State's Exhibit 50. Houston Johnson, another deputy sheriff, testified that following defendant's arrest defendant unlocked the turtle-back of his car and witness noticed a smaller piece of cloth similar to that found by deputy Downing. This was introduced as State's Exhibit 51. Shortly after the murder, the trailer hitch which had been taken from the McCoy Trailer System yard was found in a bar ditch by a young native of the area, Wayne Criner. Wrapped around the trailer hitch was a piece of the same cloth, earlier marked as State's Exhibit 40, and inside the cloth were the deceased's bill-fold, social security card, and other things, including some links of chain. Similar pieces of chain were found in defendant's automobile.

Defendant when he testified denied ever seeing either of the pieces of cloth in question, or the wrenches, or the chain links. By the testimony of Edwin R. Donaldson, FBI expert, it was established, and remained uncontradicted, that the three pieces of cloth in question were originally one piece. Such conclusion is inescapable by an examination of the enlarged photographs identified in the record as Exhibits 65, 66, 67 and 68. The threads and pattern of tears match, and the three pieces placed together fit perfectly.

We think the principle of law as expressed by Armstrong, J., in Horn v. State, 13 Okl.Cr. 354, 164 P. 683, particularly applicable to this case. There it is said:

"In the trial of a criminal case, questions of fact involving the guilt or innocence of the accused are always for the jury, and when on appeal the record discloses facts which would have been

sufficient either to warrant a verdict of acquittal or to support a verdict of guilty, the finding of the jury will not be disturbed. In such cases only errors of law will be reviewed."

See also Armstrong v. State, 61 Okl.Cr. 352, 68 P.2d 114; Fields v. State, Okl.Cr., supra, and cases cited.

■ Questions are raised as to the admission or refusal to admit certain evidence, and we have given careful thought to such points, but are unconvinced from the record before us that the trial court erred in his rulings. For instance, the defendant's wife, who worked for a Mrs. Lazarus, testified that the defendant came to get his wife in the family car the evening of December 12, 1953, arriving about 6:30, and it was sought to show by Mrs. Lazarus that after the wife came back into the house after investigating the lights of a car on the driveway and the barking of a dog, that she stated to Mrs. Lazarus that Lorenzo, the defendant, had come to get her. Witness Lazarus did not see who was driving the car that appeared on her driveway. The State had not sought to impeach defendant's wife, who testified that the person who had come to get her was the defendant, her husband. No legitimate reason appeared for relaxing the rule as to hearsay.

■ It is also argued that the court erred in refusing to permit the defendant to testify that after his arrest he voluntarily submitted to a lie detector test. The results of such a test have been held by this court inadmissible for any purpose. And in view of the uncertainty of such tests in their present state of development, our past holdings are adhered to. See Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R. 2d 1292; Id., 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673; and Toms v. State, 95 Okl. Cr. 60, 239 P.2d 812.

It is contended that the court erred in admitting in evidence the wrench found at the Williams Garage. The record fails to show that the wrench was ever actually admitted, but in view of the record it would not have constituted error for the wrench to have been admitted. That is to say, the wrench was identified as an exhibit and there was evidence introduced relative thereto. The court sustained defendant's objection to Investigator Lang testifying that Williams, the garage owner where defendant worked, had indicated to him the defendant's work bench. The fact that defendant did have a work bench at the Williams Garage and that officer Lang did take a wrench from it, seems to have been clearly admitted. As pointed out by the Attorney General, in his opening statement to the jury counsel for the defendant stated to the jury: "This wrench is not the wrench Mr. Lang took from the defendant's desk, or bench." At another point in the trial, counsel handed the wrench in question to the defendant and asked, "Do you know whether that wrench was at your work bench at the Williams Garage on the 7th or 8th of January, 1954?" To which the defendant replied: "This wrench was not there."

In their brief, counsel refer to the "alleged finding of the rag and one wrench in his car and another wrench at his work bench." The objection was not to the proposition that defendant had a work bench at the Williams Garage and that officer Lang did obtain a wrench therefrom, but the contention was that Exhibit 3 was not the wrench actually obtained. It was sought to have the jury believe that a wrench had been substituted by the officer for the one actually obtained.

■ There remains for disposition the final proposition that the court erred in permitting the jurors to separate prior to the submission of the case. This specification of error is given but cursory attention in defendant's brief, no citations being made. However, in oral argument we were much impressed with the merit of the reasoning advanced, and have felt compelled, in view of the facts peculiar to this case, to search the record carefully as to the matter, and to review our statutory provision and the prior decisions of this court on the subject. The statute, Tit. 22 O.S.A. § 853, reads:

"The jurors sworn to try an indictment or information, may, at any time before the submission of the cause to the jury, in the discretion of the court,

be permitted to separate, or to be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so themselves, on any subject connected with the trial, and to return them into court at the next meeting thereof. Such officer or officers having once been duly sworn, it is not necessary that they be resworn at each recess or adjournment. An admonition to the officer and the jury shall be sufficient."

Section 857 of the same Title provides that after the case is submitted the court must place the jury in charge of one or more bailiffs to keep them together until they have agreed upon a verdict.

Under the decided cases, if mere temporary separation were all that was involved, our problem would be simple, and could be disposed of with just a few words. But there is involved recesses for days. The selection of a jury commenced on November 9, 1954. On November 10, 1954, prior to and also after the swearing of the jury, counsel for the defendant verbally moved the court that the jury be placed in charge of bailiffs and kept together during the progress of the trial. The court refused the request.

And here was involved a charge of murder, where the jurors had been qualified for the assessment of the death penalty, and where the evidence outlined was wholly circumstantial. In all good conscience there is presented an unusual state of facts.

Clearly under the terms of the statute, and as a general proposition, whether prior to the submission of a case the jury will be kept together and placed in charge of a bailiff at all recesses, is within the discretion of the trial court, as will appear by citations hereinafter given. But the question arises as to whether or not this discretion might not be abused. And, if so, whether in an extreme case, such abuse might not require a new trial in order to afford the accused his constitutional guaranty of a fair and impartial hearing, as provided by Art. II, § 20, Oklahoma Constitution.

We proceed to consider the issues thus appearing, and involving a fundamental right.

Tit. 22 O.S.A. § 853 has been interpreted by this court many times, as our annotated statutes and digests will disclose. We would consider an opinion by Judge Edwards in Nowabbi v. State, 31 Okl.Cr. 158, 237 P. 868, and the authorities therein reviewed. That case, as in the within case, involved the trial of a co-defendant for murder, where one defendant had already been tried and convicted. In the Nowabbi case the complaint was that during the course of the trial and before final submission of the case to the jury, at intervals there would be recesses in which the jury were not held together, but were permitted to separate. The record in that case discloses that but one day was required for the presentation of evidence, and that the jury was allowed to separate but one night after the jury commenced to hear evidence. Counsel for defendant had suggested and insisted that the jury be held together. The court denied the request. There the court applied the general rule that it is incumbent upon the defendant who complains of the separation of the jury before the case is finally submitted, to affirmatively establish that by reason of the separation he was denied a fair and impartial trial; that his substantial rights were prejudiced thereby. Horn v. State, supra. In the Nowabbi case as here, there were no specific acts of misconduct alleged or shown.

As indicated, it has been established by the holdings of this court that the separation of the jury for a short period of time or overnight where not objected to by counsel, or showing by affidavits or testimony on motion for new trial that defendant was prejudiced, will not vitiate a verdict. Bilton v. Territory, 1 Okl.Cr. 566, 99 P. 163; Nowabbi v. State, supra; Cox v. State, Okl.Cr., 283 P.2d 545; Fry v. State, 91 Okl.Cr. 326, 218 P.2d 643; Martin v. State, 92 Okl.Cr. 182, 222 P.2d 534; Hobson v. State, Okl.Cr., 277 P.2d 695.

In Nowabbi v. State, supra, Judge Edwards, at page 161 of 31 Okl.Cr., at page 869 of 237 P. said:

"From these various cases [cited in the opinion] the law is settled that a trial court may abuse its discretion in permitting a separation even before a case is finally submitted to the jury."

And the court further said:

"In this case we think the trial court manifestly abused its discretion. We fail to see why, at the suggestion and request of counsel for defendant, he should not have had the jury held together in charge of a bailiff. This court, in the case of Horn v. State, supra, [13 Okl.Cr. 354, 164 P. 683] said: *'There is no doubt but that the trial court should exercise sound judicial discretion in a capital case by granting the request of either party to place the jury in charge of a sworn officer during the progress of the trial.'* " (Emphasis now supplied.)

In the Nowabbi case the error complained of was not held to work a reversal of the case. There defendant had made a complete confession and much of the State's evidence stood unrefuted. It was suggested that counsel should have set up his matters of complaint in his motion for new trial, supported by affidavits or testimony. Such was done in the within case, as will appear.

Though this court has said that a trial court might abuse its judicial discretion in such matters, we do not find a case where such abuse has been deemed sufficient to work a reversal. We do find many cases where this same principle has been applied where the trial court was held to have abused its discretion in the matter of failing to grant a change of venue. Quinn v. State, 54 Okl.Cr. 179, 16.P.2d 591, and cases cited; Rawls v. State, 86 Okl.Cr. 119, 190 P.2d 159. Manifestly each case must be considered in light of facts peculiar to it.

The record herein does not reflect the basis for objection to the separation of the jury interposed at the commencement of trial. Counsel should have dictated into the record his grounds for the motion. The only clue the record affords is the motion for new trial and the admonition included by the court on the evening of November 23, 1954 after all evidence had been submitted but prior to the jury being instructed and the case argued, when the court for the first time, so far as the record reflects, in addition to the usual admonition, said:

"Now, I request that you do not read what purports to be a report of this trial in the newspapers, or listen to it on the television or on the radio. We try these cases on the basis of the evidence which is submitted and legally admitted in evidence, and on the basis of the record and the court's instructions."

Attached to the motion for new trial were affidavits of Frank Hickman and Judge Leslie Webb, counsel for defendant, with reference to the separation of the jury. The affidavit of Frank Hickman reads:

"Frank Hickman, being first duly sworn, deposes and says: That he was one of the attorneys for the defendant throughout the trial of this action; that the trial consumed nine days of court room procedure and several days of recess. That the trial began on the *9th day of November, 1954,* by the beginning of the selection of a jury, and ended by final arguments of counsel and submission of the cause to the jury late in the afternoon of *November 24, 1954.* That from the time the jury was selected and sworn to try the cause up to the time the arguments of counsel were finished and the cause submitted to the jury, the jury was permitted by the court to separate and go their respective ways. That the trial was replete with adjournments, namely, *adjournment on Thursday, November 11, 1954* as a holiday; adjournment on *Saturday and Sunday, November 13* and *14th;* adjournment from *Wednesday noon, November 17* to *Monday morning at 9:30 A.M. November 22.* That throughout the trial there were repeated recesses where the jury was excused for periods of from five to fifteen minutes. That throughout the trial, when recesses were called, the jury would leave the courtroom and mingle with others in the corridor of

the second floor of the courthouse and not remain under the control of a sworn bailiff. That the courthouse at Tulsa has no facilities for a jury room for the jurors to retire to during recesses. That the jury in this case milled around the corridor on the same floor as the courtroom and that said corridor is narrow and it was necessary for them to rub shoulders with others because of the crowded condition thereof. That but one toilet facility is on said floor of the courthouse for men. That throughout the trial certain relatives of the deceased, including the widow, and friends of relatives of deceased were in constant attendance and during recesses of the court would retire from the courtroom to the corridor or hallway and mingle with the jurors. That on certain occasions throughout the trial the temperature of the day was unusually warm, and that the jurors and friends and relatives of the deceased and witnesses for the state would gather around a coin-operated Coca Cola vending machine. That throughout the trial, a hostile atmosphere was created against the defendant which stemmed from the friends and relatives of the deceased and certain officials in the sheriff's office who were witnesses in the cause against the defendant, and affiant believes that due to such hostility an atmosphere was created of a strong feeling against the defendant which permeated to and was absorbed by the jurors, and affiant further believes that the purity of the trial was thereby impaired and that the defendant was thereby denied a fair and impartial trial.

"Affiant further states that throughout the trial of this cause, and while the jurors were in their respective homes during adjournments, *they became subject to dissemination of news of the trial and subject to hearing again what purported to be the testimony of witnesses,* which communications became possible through the medium of *reports in newspapers, news broadcasts on five radio stations in Tulsa and three television stations, the latter of which displayed upon the television screens motion pictures of proceedings of the trial,* and affiant believes that it was impossible for the jurors to heed the admonitions of the court and not hear or see matters and things concerning the trial by means of communication aforesaid, and affiant believes that this prevented the defendant from having a fair and impartial trial." (Emphasis supplied.)

The affidavits were not controverted by the county attorney and we must assume such allegations to be true statements of fact. So far as the record reflects no evidence of witnesses were offered on the motion for new trial.

It will be observed that no specific acts of misconduct on the part of jurors or of the public trying to influence any member of the jury is set out.

Do the facts recited entitle the defendant to a new trial?

As we have plodded through the voluminous records and exhibits in the within case, noting that sixteen days expired before the completion of the case, with first a two-day recess, then a five-day recess, and the usual recesses to the completion of the case on November 24, 1954, with the jurors permitted to return to their respective homes within Tulsa County, or, in fact, to go anywhere they might wish within the periods of the recesses stated, and all this over the remonstrance of counsel for the defendant, we have become imbued with doubt that such action by the trial court afforded the defendant such a trial as guaranteed by Art. II, § 20 of our Bill of Rights, where in interpreting such provision, we have often said: "It must be borne in mind that an accused, whether guilty or innocent, is entitled to a fair and impartial trial according to due process of law, and it is the duty of courts to see that the guaranty of such a trial is upheld."

From the time previously required to try the companion case of Fields v. State, supra, the court well knew, prior to the commencement of this trial that a number of days would be consumed, and that intervening

would be one holiday, a State Bar Association meeting lasting several days; and could well understand the difficulty and great expense of keeping a jury together for contemplated recesses and adjournments, so that unless counsel would agree on foregoing the holiday and Bar Association meeting and trying the case on through such periods, the case should have been postponed.

Counsel for the defendant did stipulate with the county attorney at the time of the separation for the meeting of the State Bar Association that inasmuch as the court had for the previous several days of the trial and prior adjournment and over his objection permitted the jurors to separate, that he would not insist that they be held together during the State Bar meeting, but he stated that he did not mean to waive his objections and exceptions to the ruling of the court when the trial commenced, permitting the jury to separate.

In addition to the matters recited, we have noted that the record herein reflects that there was an unsolved murder that had occurred about the time of the Royster murder, where there was suspicion that defendant's revolver had been used in that crime, and that a complaint had been or was about to be filed against defendant for that murder. This was not revealed to the jury in the trial of the within case, but would it not be reasonable to assume that such rumor would likely reach the ears of jurors who were for days out over the county and perhaps the State? Since the days of the case of Nowabbi v. State, supra, radio and television, news commentators and fast photography have become established facts and a part of our way of life, and present problems to be coped with. The problem of preventing jurors from being consciously or subconsciously influenced by outside information in cases before them have multiplied.

After much deliberation we think that the trial court herein, cognizant of the possible recesses that could be contemplated during the period of trial of the within case, should have, prior to the commencement of the trial, reset the case, in the absence of an agreement that there would be no ad-

journments, except for Sundays, and that at all events the trial taking place, that the court abused its discretion in failing to keep the jury together during the course of the trial. We find this to be an extreme case.

In support of this thought the reasoning of Baker, J., in Bilton v. Territory, supra [1 Okl.Cr. 566, 99 P. 165], sustaining the proposition that the court erred is presumed after submission of a case to a jury where they are allowed to separate, is just as valid in a case with facts as herein set out. Said Judge Baker:

"The object intended to be gained by preventing the separation of the jury is to safeguard in every possible way the purity of the stream of justice; to prevent it from in any manner being polluted by influences other than that which are produced by the legal evidence and the law governing the case. Such a course is both a protection to the interests of the state in bringing to justice one who may have committed a crime and safeguards the rights of the accused on trial for his life. It will be conceded by all interested in the administration of justice that one accused of crime is to be convicted or acquitted only upon the evidence given in his presence; that the minds of those who are to decide questions involving life and liberty are free from prejudgment; that in the course of the trial no impression ought to operate on their minds, except that which is derived from the testimony presented to them in open court and the law as given them in charge by the court; that the minds of the jurors shall be free from prejudice and bias, either for or against the prosecution or the accused before the trial begins, and shall continue impartial until they have delivered themselves of their verdict. This can be guaranteed only by preventing the separation of the jury, and the prudence and care of the trial court and the officers thereof. Such a course of procedure will free the minds of the public as well as the parties directly interested in the trial of the case from the slight-

est suspicion that the stream of justice is not in all respects pure and free from contamination. Absolute impartiality and fairness in the trial of criminal cases should be desired by all concerned. Preventing the separation of the jury offers the best means to prevent undue and unlawful influences. To keep the jury from separating may at times be difficult of accomplishment, but the trial court should make proper provision therefor, and the rule against the separation of jurors in capital cases should in no manner be relaxed."

For the reasons given, this case must be and the same is reversed, and the defendant is granted a new trial consistent with this opinion.

JONES, P. J., and BRETT, J., concur.