**Claude GREEN, Plaintiff in Error,**

v.

**The STATE of Oklahoma,
Defendant in Error.**

**No. A–12458.**

Criminal Court of Appeals of Oklahoma.

Dec. 11, 1957.

Hal Welch, Vester Songer, Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam. H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Claude Green was charged by information filed in the district court of Choctaw County with the crime of murder, was tried before a jury and convicted of the included offense of manslaughter in the first degree, and his punishment fixed at ten years confinement in the State Penitentiary.

The information charged that the defendant did on the 1st day of July, 1956, make an assault upon Alean Green (his divorced wife) with a certain loaded pistol, and that he shot her and she died from the effect of the wounds inflicted.

For reversal of the conviction, six specifications of error are advanced, which will be considered in the order presented. But a short summary of the evidence is indicated for clear understanding.

The deceased, Alean Green, was the mother of three girls, the eldest 15 years, another 13, and a younger girl. They lived with her in the rear of a beer tavern located on the Hugo-Paris, Texas, highway, and north of Red River. The defendant was the father of the children, and he and the deceased had only recently been divorced, and had prior to the divorce jointly operated the beer tavern, but the wife in the divorce proceeding had gained the care and custody of the children, and title to the tavern fixtures, to afford her a business for the support of the family.

Defendant said that he arrived at the beer tavern on the Red River to see his children and confer with his ex-wife the morning of July 1, 1956.

Verdie Lee Green, daughter, aged 13 years, testified that her father arrived about 9 o'clock; that the family was up and a man called "Sis" was in the tavern; that her father and mother visited and then her father left but came back after a time. The eldest daughter and her boy friend had left the place at the time the father returned. Witness was asked if she heard any conversation between her mother and father, after he came back. She testified:

"A. Yes, sir, when he came back. You know he went off and came back, and me and her [her mother] and my littlest sister went to the car and he said he wanted to take us to town to the show, and she said, 'Claude, go on and cool off, if you come back maybe they can go somewhere with you', and

she went in the house. She did not get all the way until he got his gun out and she came back and I followed her.

"Q. I did not follow you. When your mother told him to go on and cool off, what did your mother do? A. Christine went in and I went in. She got in two or three steps of the house and I guess she saw him in the window, there was a mirror at the window, and she turned and hit me on the leg and I turned to the door and then I followed her.

"Q. Did you see your father? A. Yes, sir, I saw him out of the window.

"Q. What was he doing? A. He was fooling with the gun. I don't know what he was doing with it.

"Q. While your mother was at the house? A. Yes, sir.

"Q. And she had told your father to go on and cool off? A. And come back.

"Q. And you and her and Christine, your baby sister had gone to the house? A. We got in the house. She got in two or three steps and turned around and hit me on the leg, didn't mean to, and kind of grabbed me and I turned around and followed her out of the door.

"Q. At the time you turned around was your mother still in the house? A. No, I don't know how many steps she took out of the door. I got about one step out of the door.

"Q. You say when you turned around you could see your father? A. Yes, out of the window.

"Q. And your mother had just turned around to go out of the doorway? A. I don't know how many, one or two steps and I followed her and took about one step out of the house.

"Q. And your father was in the yard? A. Yes, sir.

"Q. When you first turned around did he have the gun in his hand at that time? A. Yes, sir.

"Q. What did your mother do then? A. She went towards him and he was backing up.

"Q. What did she say? A. 'Claude, don't do'—and that was all, she got a part of that, but didn't get all that out of her mouth."

She testified that her father fell to the ground after backing up. Her mother was on the ground, and she went to her father and took his hand that was holding the gun and admonished him, "Don't do that." She said that her father got up and got help to put her mother in a car for the purpose of taking her to a hospital in Paris, Texas. Other parties took her mother to the hospital.

Claudette Green testified that her father called at her mother's place in Choctaw County the morning of July 1, 1956, and she observed them talking. She was asked:

"Q. Do you know anything at all about what they were talking about at that time? A. No, sir, except she wanted him to go on and leave her alone. She wanted him to leave.

"Q. Did she say why? A. She wanted him to quit pestering her.

"Q. Was your father that morning imbibing any, in other words, could you say whether or not your father was drinking? A. I don't know. He either had been drinking or he was drinking.

"Q. He left the impression with you that he was somewhat under the influence of intoxicating liquor? A. I guess so. I am not sure, but he had the odor of it."

She testified to having heard her father, after the divorce proceedings were instituted by her mother, threaten to kill her if she did not live with him.

On cross-examination by defense counsel, it was developed that the deceased and de-

fendant quarrelled frequently, but witness denied that she had heard her mother threaten her father. She said that she had seen her father strike her mother. She denied hearing her father say, "Now, Alean, I know you are sick with diabetes and I am not going to fight you". She did admit that her mother had fought with her father. She was asked: "But most of the time he would stand and let your mama beat him, wouldn't he? A. That was because he wasn't able to hit back, he was intoxicated."

Clarence Clawston testified to being at Mrs. Alean Green's place the morning of July 1, 1956. And to Mrs. Green getting in defendant's car and talking with him for quite a while; to defendant leaving and thereafter returning. He said that he was in the place reading a book on astrology; that he first sat at the counter and then got in a booth. He heard the defendant and deceased talking outside and heard the defendant mention that he wanted to take the children to a show, or some place. He denied ever advising Mrs. Green not to permit the defendant to do that. He said that he heard a shot fired and that he got up; that he was in a booth next to a window on the north side; that he looked out and saw defendant with a gun in his hand; that the deceased was four or five feet away. He said that Mr. Green hollered and he heard defendant say something about coming in and shooting witness; witness said that he hurriedly departed by another door, but later came back.

Dr. Donald Lewis, of Paris, Texas, testified that Mrs. Alean Green was admitted to the sanitorium in Paris on July 1, 1956, suffering from two gun shot wounds. He was asked to describe the wounds. Said he:

"Q. Did you perform any operation on her shortly after she was brought to the hospital? A. Yes, she was bleeding in the chest and I explored the chest wound. It did not go into the chest cavity. Then an exploratory laparotomy of the abdominal cavity, and the bullet did not go into the peritoneal cavity. That was closed on the outside and by debridgment that was cleansed.

"Q. After that did you have occasion to subsequently operate on Mrs. Green? A. She had an internal fixation of the fracture of the hip. That we got under part control and that was a fixation.

"Q. And Mrs. Green was a patient continuously in the hospital from the first of July until the 17th? A. Yes, sir.

"Q. And was she at any time during that time able to be out of the hospital or was she confined to bed all that time? A. We kept her in bed on account of the hip, the fracture of the hip.

"Q. Mrs. Green is now dead? A. That is right.

"Q. From your waiting on Mrs. Green—well, kill that. Subsequent to her death, did you have occasion to make any examination of Mrs. Green? A. We did.

"Q. What did you do in regard to that? A. We did an autopsy, a post-mortem examination.

"Q. From the history of the case as you know it, from the first of July through the 17th of July, from the 1st to the 17th and as a result of the post-mortem examination, what did you find was the cause of Mrs. Green's death?"

Witness was then interrupted by objections and questions from defense counsel, but defense counsel was overruled and witness said that death was caused by pulmonary embolism. The following then transpired:

"Q. Will you tell the jury what 'pulmonary embolism' is? A. A blood clot which forms in one part of the body, breaks loose and travels through the cells and lodges in the circulation to the lungs, and obstructs the circulation to the lungs, and may be considered the cause of death from the blood clot.

"Q. Are you in position to testify what in your judgment was the occasion of the blood clot? A. The occasion of the blood clot, we feel that the blood clot arose probably in the left vein of the left leg. What else do you mean?

"Q. What was the direct cause of the blood clot? A. We figure it was the result of the injury that caused this long period following the operation that result after the surgical procedure of the injury, or anything that requires bed rest.

"Q. Those contributing factors you testify to as being from the operation, was that from the gun shot wound? A. It was one or the other, sir.

"Q. And the operation you refer to was occasioned by reason of the gun shot wound? A. Yes, sir, the second wound, and the pulmonary embolism occurred due to the fixing of the hip which had been fractured by the bullet.

"Q. And the gun shot wound was the contributing factor to the blood clot which contributed to her death?

"By Mr. Welch [attorney for defendant]: We object to that, and it is not what the doctor said.

"Q. What, if anything, did the gun shot wound have to do with the death of Mrs. Green?

"By Mr. Welch: That is objected to, assuming that the gun shot wound had anything to do with it. I think he would have to go to the blood clot itself to find the cause of death.

"By the Court: Overruled, exception allowed.

"You may answer the question— What, if anything, did the gun shot wound play in connection with Mrs. Green's death?

"Mr. Welch: If you know.

"Q. Yes. A. I think death was due to pulmonary embolism, which was the result of the injury, without which it probably would not have occurred."

The defense offered Dr. Floyd Waters to explain pulmonary embolism, its significance, etc. He said an embolism or blood clot could be from any type of injury, even a broken leg. Also a number of witnesses were offered to show that the deceased was suffering from sugar diabetes, had a high temper, and physically was much stronger than the defendant, weighing over 200 pounds. She had taken a chain and run a boy out of her tavern for bothering one of her girls. Agnes Hill said that the deceased did not drink, but that sometimes she would be "higher than a kite". She said that Mrs. Green took reducing tablets, and acted "high" thereafter.

The defendant testified. He said that he had been in Lubbock, Texas, and that his former wife, the deceased, had agreed to close the beer tavern on the river and move to Lubbock to operate a cafe the defendant had arranged to put in, and thereby get the girls "off the river".

Defendant said that he arrived at the beer tavern on the Red River for the purpose of effecting the move the early morning of July 1, 1956, the day of the tragedy. He told about several conferences with the deceased concerning the moving, etc. He then went to look over a machine for making cement blocks that he had in a nearby field. He planned to take the machine with him in the trunk of his car. He said that his former wife wanted an automatic pistol he had in a suit case, and that he would not agree for her to have it, because he had to grab her arm in the past to keep her from shooting someone. Said he:

"Q. Go ahead. A. Then when I told her she wouldn't get the gun, I put it in my bosom and I shut the door, the side door, and I said, 'Alean, what in the world has come over you, what in the world is the matter, why don't you let the children go to the show, I can't be here long, there would be someone

to take care of them while you kept the little tavern.' And she said, 'Sis is the one that doesn't want them to.' I said, 'What has Sis got to do with my children going with me?' And I started to the door, and when I started to the door, she started for the gun and I grabbed it too and it come out, and when it came out she got hold of it with her right hand and then it went off.

"Q. How quick were the first two shots? A. I have no way of telling but I imagine as quick as they could fire, all three of them.

"Q. And it was an automatic? A. Yes, sir.

"Q. What position were you in when the third shot was fired? A. I was on the way to the ground, I was falling.

"Q. How did you fall? A. I had hold of the gun and she was pulling on it. When the second shot fired she started falling, I did too, from being over-balanced pulling the gun.

"Q. Did you intend to shoot her? A. No, I really did not.

Defendant then told about getting help to get his wife to a hospital in Paris, Texas. He said that a boy had a half pint of whiskey in defendant's car, and after the shooting defendant got in and drank part of it and threw the rest out. That on the way to Paris he ran out of gas, and flagged a car and Tot Davidson took his wife on to the hospital. He said that he had blood on his clothing, and that he did not go to the hospital. When he reached Paris, he hired a taxi and was driven back of a cemetery where he changed clothes and that he then went to the home of his brother, where he was later arrested. He waived extradition and was returned to Hugo, Oklahoma.

In rebuttal Joel Daniel Young testified that on the morning of July 1, 1956 he was engaged in sweeping the floor in Pearl's Place, next door to Alean Green's place on the river, and that he heard a gun shot and looked out a window and saw the defendant and Alean Green at the northwest cor-

ner of their building, both were on the ground, and the defendant was crawling towards Alean and picked up his gun and stuck it in his bosom and went over to Alean. He said that when he looked out of the window he saw the daughter, Verdie Lee, running towards her parents.

Verdie Lee Green on rebuttal testified:

"Q. Verdie Lee, did you see any scuffle at all between your father and mother? A. No, sir.

"Q. Did you ever see your mother close enough to your father to scuffle over the gun? A. No, sir."

It is first asserted that the court erred in not granting a new trial because of the alleged separation of the jurors after the case had been submitted to them for decision.

The basis for the proposition that the jury was permitted to separate after the case was submitted to them arises out of the method of housing or sleeping the jury during the night recess. Two witnesses testified for the State in rebuttal to an affidavit filed by counsel for the defendant and to the effect that the jury had been separated and quartered in seven separate rooms for sleeping purposes, and that defendant's rights were thereby prejudiced. On motion for new trial the record developed that the jury consisted of eleven men and one woman; a male bailiff waited on the eleven jurors, and a female bailiff waited on the woman juror. Quarters for the jury were not available at the court house, and it was necessary that the jury be quartered at the Webb Hotel. This was a three-story hotel without elevator, apparently, and the jury was quartered on the third floor, away from the normal mixing with the patrons of the hotel. A central stairway was used. In this particular part of the hotel, seven rooms were assigned the jury; one being occupied by the woman juror and woman bailiff, and the male bailiff and eleven jurors occupying the other six rooms. There were no connecting doors, but the rooms all opened into a common hall in a separate half of the third floor

of the hotel, such half being referred to as a "wing". There was but one straight hall, all rooms opening into the common hall. The bailiff, Bob Jones, left the door leading into the hall in question partly open so that he might hear persons ascending the stairs or entering the hall. Part of the rooms had toilet facilities, and part did not. The bailiff heard persons during the night going to and from the public toilet. In just what part of the third floor the public toilet was located was not shown. The bailiff said that he slept very little, and took his charges to the hotel about 10 o'clock at night, and left at six o'clock in the morning. Witness was asked: "Did any member of the jury communicate with anyone other than the bailiffs and among themselves?" He answered: "I don't think so. If they did, I know nothing about it." He said that the lady bailiff and lady juror occupied a room at the opposite end of the hall from his room, and that the other jurors were in between. He heard no one on the stairway.

Gene Knox, night clerk at the hotel, testified that no one occupied any part of the "wing" where the jury was quartered except jurors. He further said that no rooms were rented on the third floor after the jury was assigned the "wing" in question. He said that the porter showed the jurors to their rooms, and he knew of no one except the porter going to the third floor after the jury was assigned rooms there, but he could not be sure. The clerk repeated on cross-examination that no guests were quartered on the third floor of the hotel, other than the jurors, and they were in one "wing". He was not sure whether anyone went to the third floor after the jurors were shown to their rooms or not. He said guests were assigned to the second floor but not the third. But he admitted, on cross-examination, that the day clerk was sleeping on the third floor, and that the hotel porter was free to come and go on that floor.

22 O.S.1951 § 857 reads:

"After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court."

The question raised by the facts recited have given this court some trouble, and the issue merits detailed treatment.

We have reread the record and the many cases from this court that have given consideration to the applicable statutory provisions that we have quoted above, as well as cases from other jurisdictions having comparable statutes. We must keep in mind certain basic principles that have been adhered to throughout the history of this court. In construing our statute, Judge Baker said, in Bilton v. Territory, 1 Okl.Cr. 566, 99 P. 163, that it "imperatively requires that upon the final submission of the case to the jury, they cannot be permitted to separate, and if permitted to separate, such separation vitiates the verdict, notwithstanding no affirmative evidence of prejudice is offered."

The statutory provisions, of course, were designed to preserve inviolate the right to, and the purity of jury trials. Grable v. State, 60 Okl.Cr. 339, 44 P.2d 152.

It is uniformly held that on proof of separation of jury after final submission of case, prosecution has burden to show that no injury could have resulted to defendant therefrom. Selstrom v. State, 7 Okl.Cr. 345, 123 P. 557; Goins v. State, 9 Okl.Cr. 35, 130 P. 513; Crow v. State, 39 Okl.Cr. 145, 263 P. 677; Sealy v. State, 59 Okl.Cr. 104, 56 P.2d 903; Dutton v. State, 75 Okl.Cr. 375, 131 P.2d 777; Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637; Green v. State, Okl.Cr., 281 P.2d 200.

But it is urged by the State that the facts peculiar to the within case do not disclose a separation of the jury. It is said that Lemke v. State, 56 Okl.Cr. 1, 32 P.2d 331, is

applicable. A careful reading of that case fails to disclose the sleeping arrangements of the jury. It is shown that the jury occupied one side of the hotel on the second floor of a hotel, but whether they occupied one room or several connecting rooms with doors to hall locked, is not shown. It was held that a division of the jury by placing them in different sleeping quarters was not a separation, and that a mere temporary separation for a purpose as the use of a toilet, or the use of a telephone, or kindred reasons is not within the meaning of the law forbidding a separation of the jury. Cited from this jurisdiction in support of the holding are the cases of Elkins v. State, 29 Okl.Cr. 175, 233 P. 491, and Forester v. State, 36 Okl.Cr. 111, 252 P. 861.

In the Elkins case the jurors were separated for sleeping purposes, using two rooms, but there was a duly sworn bailiff in each room. In the Forester case the only separation occurred when the bailiff took a member of the jury to the lavatory, locking the remainder of the jurors in the sleeping quarters until he returned from the lavatory with the other member of the jury. And in the Forester case the prosecution at time of hearing on motion for new trial offered in evidence, either testimony or affidavit from all jurors, and by them established that no person conversed with any juror after the submission of the case.

In Dutton v. State, supra, ten jurors slept in a room with one bailiff, and two slept in a room with another bailiff, and on another occasion, with the same jury, eleven jurors were left in charge of one bailiff and the other bailiff took one of the jurors to a barber shop. The juror who went to the barber shop, the bailiff who accompanied him and two other witnesses, who were in the barber shop were called by the prosecution and testified to facts which established that prejudice could not have resulted.

In Landers v. State, Okl.Cr., 281 P.2d 193, a Negro juror was placed in the care of a deputy sheriff and night jailor for the purpose of providing sleeping quarters for said juror in the juvenile ward of the county jail, while the other eleven jurors remained in the custody of the sworn bailiff. It was held by the court:

"After a case has been finally submitted and the court has instructed the bailiff to keep the jurors together and not allow them to separate, it is error to allow one of the jurors to sleep in the juvenile ward of the county jail while the bailiff and other jurors are at another place, and there is no one present with the juror, at the jail, acting under orders of the court as a bailiff."

In Tillery v. State, 23 Okl.Cr. 226, 214 P. 198, seven jurors and one bailiff slept in one room of a hotel and five in another room of the same hotel in charge of a sworn bailiff. This was held not to constitute "separation."

The Missouri case of State v. Shawley, 334 Mo. 352, 67 S.W.2d 74, is cited by the State. It is a case with facts very similar to the facts in the within case, except in the Shawley case the bailiff occupied a cot in the hall between two rooms, so that the only method of communication with any of the jurors was either through outside windows or passing by the bailiff's cot in the hallway. The evidence with reference to the matter disclosed that no one had opportunity to talk to any juror.

The Shawley case was affirmed, but the court took pains to distinguish it from State v. Asbury, 327 Mo. 180, 36 S.W.2d 919, 921, where there was opportunity by reason of sleeping arrangements for the jury to be influenced by other hotel patrons. In the Asbury case the rooms were not connecting and the sheriff slept in one of the rooms, and the doors were left open. But because other people were on the same floor of the hotel, and the sheriff stayed in a separate room with one of the jurors, the case was reversed. The Missouri court said:

"Under such circumstances, it can hardly be said that the officer prevented 'any opportunity for misconduct on the part of the jurors, or suspicion of im-

proper influence upon them.' On the contrary, we think opportunity was given not only for outsiders to use improper influence on the jurors, but for some of the jurors to use improper influence on other jurors."

In Nicholas v. Commonwealth of Kentucky, Ky., 286 S.W.2d 542, decided in 1956, two women jurors were allowed to go to the sheriff's home in company with the bailiff, one of the remaining ten was by agreement excused from confinement; nine of the jurors together with the sheriff occupied five rooms at the hotel; two slept in each room; which is to say, the sheriff slept in a room with one juror, and the other eight jurors were divided up, two each in four rooms. The sheriff left his door open, and each of the doors of the rooms occupied by other members of the jury were left open.

The court in its opinion, in reversing the case, referring to the case of McElfresh v. Commonwealth of Kentucky, Ky., 243 S.W. 2d 497, said [286 S.W.2d 544]:

"We pointed out there that where sufficient opportunity is afforded for the exercise of improper influence on one or more jurors, the burden is upon the Commonwealth to clearly establish that the separation gave no opportunity for the exercise of improper influence, and a mere assertion that nothing harmful could have occurred will not prevent a reversal where the opportunity to perpetrate harm has been conclusively shown."

From a study of the cases cited, it seems clear that in the within case the State failed to meet its burden of clearly establishing that the separation of the jury as recited gave no opportunity for the exercise of improper influence.

It is true that on motion for new trial the State produced as a witness the bailiff, whose testimony has been summarized. Also the night clerk testified, but the State failed to call the day clerk who occupied a room on the third floor, and so far as the evidence discloses may have used the same public toilet with part of the jurors, and had opportunity to converse with them. Also the porter who had access to the third floor did not testify. Roomers on the second floor had access to the third floor, and the night clerk had no way of knowing whether any occupant of the second floor may or may not have gone to the third floor in the night time. Also the State failed to show whether or not there were telephones in any of the rooms occupied by the jurors, and where the bailiff was not in position to say whether such telephones, if any, may or may not have been used. None of the jurors were called to testify, nor were affidavits from the jurors concerning the matter offered. There was no evidence of the location of the public toilet visited by various jurors during the course of the night, or whether other persons were present at the time one or more juror may have been present.

Under the circumstances recited, and in view of the fact that the bailiff did not occupy a bed or cot separating the rooms occupied by the jurors from the other part of the hallway, we conclude that the State failed to meet its burden of showing that the defendant was not prejudiced by the sleeping arrangements of the jury, as recited.

It is next contended that the trial court committed fundamental error by the giving of Instruction No. 3, by reason of the fact that the court did not proceed further and define the term "misdemeanor". Whether or not such omission would constitute error would depend upon the charge and the facts peculiar to a given case. The instruction is similar in wording to Instruction No. 4 given and set out in the opinion in Palmer v. State, 78 Okl.Cr. 220, 146 P.2d 592, cited by defendant, and in that case the conviction of Palmer was reversed because the court failed, along with the commission of another serious error, to define the term "misdemeanor".

The argument is ingenious, but a study of the Palmer case will disclose that the information charged the defendant Palmer with the crime of manslaughter in the first

degree, and alleged that the defendant was committing a misdemeanor, to-wit: Assault and battery, upon the deceased. The combatants had engaged in a fist fight.

In the within case, as we have seen, the charge was murder by shooting with a pistol.

The instruction complained of, together with Instruction No. 14 covering the facts in the within case, read:

"No. 3. Manslaughter in the first degree is committed when prepetrated by any person without a design to effect the death of the person killed, and while the perpetrator of the homicide is engaged in the commission of a misdemeanor; or when perpetrated without a design to effect the death of the person killed, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; or when perpetrated unnecessarily, either while resisting an attempt by the person killed to commit a crime, or after such attempt had failed."

"No. 14. If you do not believe from the evidence, beyond a reasonable doubt, that the defendant is guilty of murder as herein defined to you, then you may consider all the facts and circumstances in the case as to whether or not you believe from the evidence beyond a reasonable doubt that the defendant is guilty of manslaughter in the first degree, as herein defined to you.

"And you are instructed that if you believe and find from the evidence in this case, beyond a reasonable doubt, that the defendant, Claude Green, did, in Choctaw County, Oklahoma, on or about the 1st day of July, 1956, unlawfully, wilfully, feloniously, without justifiable or excusable cause, and without authority of law, and without a design to effect the death of the said Alean Green, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, or unnecessarily, while resisting an attempt by Alean Green to commit a crime, or after such an attempt had failed, shoot and kill the said Alean Green, then it will be your duty to find the defendant guilty of manslaughter in the first degree."

■ Counsel did not except to the instructions given, or request any additional instructions. We conclude by reason of the facts peculiar to the within case that the court did not err in defining the term "misdemeanor."

At the close of the State's evidence defendant interposed a demurrer, predicated upon the proposition that the evidence was wholly insufficient to establish that the death of the deceased was caused by the defendant. This was based upon the fact that both Dr. Donald Lewis, who attended the deceased from July 1 to July 17, 1956, when she died upon the operating table, and Dr. Floyd Waters, who was called by the defense, testified that the immediate cause of death was pulmonary embolism. Dr. Lewis explained this as being a blood clot which from the autopsy performed, indicated that it formed in the left vein of the left leg, and a portion broke loose, made its way through the vein and finally to the lung, where it caused the death of Alean Green. It was Dr. Lewis' opinion, however, that the chain of causes and effect did not begin with the formation of the blood clot, but originated with the act of the defendant shooting the deceased. This act ultimately lead to the formation of a blood clot by reason of the forced rest and inactivity of the defendant, who had to rest in bed by reason of two bullet wounds, the first one having hit above the clavicle or collar bone, and having left the body through the back, the scapula. It did not go into the chest cavity. The second entered the side of the abdomen and came through the left buttock, causing a fracture of the hip at the neck of the femur. The testimony of Dr. Lewis concerning this point has already been quoted above. It was his conclusion, as recited in the summary of the evidence: "I think death was due to pulmonary embolism, which was the result of an injury,

without which it probably would not have occurred."

Witness further said that it was his conclusion that Mrs. Green died indirectly by reason of the gun shot wound that she received.

■ The record discloses that the court very carefully and fully and correctly instructed the jury upon this issue, and the jury found the issue against the defendant. The principle enunciated in Pitts v. State, 53 Okl.Cr. 165, 8 P.2d 78, in paragraph 1 of the syllabus, is applicable to the within case. It reads:

"Where the evidence discloses that two or more wounds were inflicted upon the deceased, the test as to the guilt of the person inflicting the first wound in such case is whether, when death occurred, the first wound contributed to the event. If it did, although other independent causes also contributed, the causal relation between the unlawful acts of the accused and the death is made out. If the life current went out from both wounds, so that at the very instant of death the first wound was contributing to the event, the one who inflicted it is criminally responsible."

Counsel for defendant argues his fourth and fifth propositions together. These relate to certain testimony and to alleged misconduct of the county attorney in propounding improper questions. It is said that the trial court erroneously allowed the State to introduce evidence over the objection of the defendant, of other crimes allegedly committed by the defendant, not connected with the offense charged, and that the county attorney was guilty of misconduct by his continued reference to the fact that the defendant had been arrested several times for drunkenness, and about the deceased being afraid of the defendant.

In Sawyer v. State, 94 Okl.Cr. 412, 237 P.2d 167, 168, this court said in paragraphs 3 and 4 of the syllabus:

"In a homicide case, evidence of the relation of the parties, ill treatment, previous assaults and difficulties, where not too remote, are admissible as tending to establish motive, intent, and state of mind of the parties. Such evidence is not to be excluded although it may tend to prove some other offense. But in such case the court should by proper instruction restrict such evidence to the purpose for which it is admitted.

"Evidence of a fist fight between the defendant and deceased, which occurred about sixty days before the homicide, was admissible in evidence for the purpose of showing the feeling and relationship that existed between the parties, and is not subject to the objection that such altercation was too remote from the time of the homicide to be admissible as evidence."

■ Also the court of Criminal Appeals of Texas in Kelman v. State, 134 Tex.Cr.R. 535, 116 S.W.2d 721, held that proof of antecedent menaces, prior assaults, former grudges and quarrels between defendant and deceased may be proven to show defendant's state of mind, malice and motive.

■ While the county attorney did go too far in a number of questions, the court was careful in its rulings and struck from the consideration of the jury questions that seemed to go too far. Most of the evidence showing prior frictions, arguments and fights between the defendant and deceased was developed by the defense, through defense witnesses. It was attempted to show that the deceased was a large woman and capable physically of getting the best of her husband, that she was high tempered and beligerant, etc. Much was developed by defense that was wholly irrelevant and incompetent. We do not find reversible error in these matters complained of.

■ The sixth proposition is devoted to the assertion that the sentence should be modified. It must be remembered that the defendant was charged with murder, where the death sentence could have been imposed, but the jury found him guilty of manslaughter in the first degree, where the punishment prescribed could be from four years

to life. 21 O.S. 1951, § 715. The punishment fixed was near the minimum, and we find nothing that would justify this court in modifying the sentence imposed, if it could be affirmed.

The case must be reversed for a new trial by reason of the State failing to meet its burden of showing that the separation of the jury complained of gave no opportunity for the exercise of improper influence.

Judgment reversed and defendant granted a new trial.

BRETT, P. J., and NIX, J., concur.