2004 OK CR 23

**Calvin Lee JOHNSON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2002–834.**

Court of Criminal Appeals of Oklahoma.

June 15, 2004.

**42**

James Bowen, Wayne Woodyard, Sapulpa, OK, Attorneys for Appellant at trial.

Don I. Nelson, Carol Iski, Sapulpa, OK, Attorneys for the State at trial.

Wayne Woodyard, Sapulpa, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## *OPINION*

STRUBHAR, Judge:

¶ 1 Appellant, Calvin Lee Johnson, was convicted of First Degree Murder in the District Court of Creek County, Case No. CF–99–372, after a jury trial held before the Honorable Donald D. Thompson. The State filed a Bill of Particulars alleging three aggravating circumstances: 1) that Appellant had previously been convicted of felonies involving the use or threat of violence;[1] 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;[2] and 3) the existence of a probability that Appellant would commit acts of violence that would constitute a continuing threat to society.[3] The jury found the existence of two of the alleged aggravating circumstances, that Appellant had previously been convicted of felonies involving the use or threat of violence and the existence of a probability that Appellant would constitute a continuing threat to society. The jury assessed punishment at death and the trial court sentenced Appellant accordingly.

---

1. 21 O.S.1991, § 701.12(1).

2. 21 O.S.1991, § 701.12(5).

3. 21 O.S.1991, § 701.12(7).

From this Judgment and Sentence Appellant has perfected his appeal.[4]

## FACTS

¶ 2 On October 31, 1999, at approximately 3:10 a.m., Sapulpa Police Officer Jamie Noe responded to a 911 call reporting a homicide. When Noe arrived at the residence from which the call originated, he saw several people standing in the street. One person, Marilyn Howell, seemed particularly upset and agitated. Noe approached Howell and learned that she had discovered the body of the man who had been killed. She directed Noe to the house at 911 West Johnson. Noe and Officer Mark Swafford entered the residence and saw a man, subsequently identified as Russell Milton, on the kitchen floor. He had a large wound to his head and was obviously dead. Noe noted that the victim's pants pockets were turned inside out and his vehicle outside the house had been vandalized. It was later established that Milton had been shot with a shotgun and .12 gauge wadding was found at the scene of the homicide.

¶ 3 Through their investigation, the police learned that about three weeks before his death Milton received a substantial disability check for back pay. It was known throughout the community on "the Hill," where he lived, that Milton had come into money as he told some people about it and used some of the money to buy a new pickup. Milton was known to carry his money on him, neatly folded in his pants pocket.

¶ 4 When questioned, Marilyn told the police that Appellant might have killed Milton. Appellant was the boyfriend of Marilyn's sister, Sharon Roberson. Marilyn explained that about two weeks earlier when Appellant and Sharon were at Marilyn's house the three of them planned to go ask to borrow money from Milton. Appellant said that if he didn't get money from Milton he was going to "knock him in the head." Marilyn also said that Appellant had two shotguns which he kept in a shed behind her house. One of them was a sawed-off shotgun Appellant called 'Shorty.' Appellant moved the guns out of the shed a few weeks before Milton was killed.[5]

¶ 5 Sapulpa Police Detective Mike Reed first interviewed Appellant around noon on October 31. At this time Appellant denied knowing anything about the homicide. He said the prior evening, he had been over on the Hill working on a vehicle for a relative and then he went to Buford Colony, where his mother lived. Appellant told Reed that later he came back into town, picked up Glenn Pickens and they went to the club and picked up Sharon. He then took Pickens home and he and Sharon went to Sandy Abraham's house. When they left Abraham's house they went back to Buford Colony to his mother's house where they spent the night. They arrived at his mother's at about 12:30 a.m. Appellant gave this same information when he was interviewed a second time on November 1.

¶ 6 When Appellant was interviewed again on November 19, he talked about 'Shorty' and told police that it was a .12 gauge sawed-off shotgun. When asked where the gun was, Appellant gave several answers. He denied knowing where 'Shorty' was, he claimed that 'Shorty' had been buried and he said he sold the gun although he later denied this. Appellant also denied knowing that Milton had come into money or killing him.

¶ 7 During Appellant's final interview with the police on November 21, his account of his knowledge of and activities surrounding Milton's death changed considerably from the other interviews. During this interview, Appellant acknowledged that he knew Milton had come into some money. He claimed that Sharon planned to either play him out of the money or rob him. Appellant said that he refused to participate in the robbery but offered to do the driving for a cut of the

---

4. Appellant's Petition–in–Error was filed in this Court on August 29, 2002. His Brief–in–Chief was filed on July 28, 2003, and the State's Response Brief was filed on November 25, 2003. Appellant's Reply Brief was filed on December 15, 2003. The case was submitted to this Court on December 4, 2003, and oral argument was heard on March 30, 2004.

5. Appellant's gun, 'Shorty,' was never recovered nor was any gun identified as the murder weapon in this case.

money. He told police that Sharon and a masked man he later learned was Marilyn Howell's son, Munkin, walked to Milton's house and went in the front door.[6] Appellant said he watched this from a gray Cutlass he had stolen from the Bartlett hospital.[7] Appellant heard a noise from inside the house. He said that he didn't know if it was a shot or somebody just hitting the floor. He first said that Munkin came out the back door but then said that they both came out the front door. Appellant said that Sharon put the padlock on the outside of the door and the two walked away from the house.[8] Appellant picked them up, dropped Munkin off at his mother's house and dropped Sharon off at the Club. At first Appellant said that Sharon got the money but he later said that she had been unable to find the shoebox in which Milton kept the money.

¶ 8 At trial Sharon testified that the week before Russell was killed, she was staying with Appellant. After a fight, she left and spent a week hiding from him and staying with various other people. On Saturday evening, October 30, a friend drove Sharon to Russell's house so that she could ask for money. His door was locked with a padlock on the outside but his new pickup was there. Although she thought it unusual for Milton to be out after dark, she assumed he was gone because the house was locked and no lights were on. They left and went to a club on the hill where she got into a car with some other friends and they drove to a liquor store. It was between 8:00 and 8:30 p.m. at this time. They drove back to the club and Sharon got out of the car and walked to Sandy Abraham's house where she stayed for an hour and a half to two hours before she and Sandy walked back to the club. They arrived at about 11:00 to 11:30 p.m. While she was at the club, Appellant's cousin, Glenn Pickens, came in and told her that Appellant wanted to talk to her. Appellant came in right after

that and told her to come with him. She got into the car with him—a tan Lincoln which belonged to his mother—and they drove back to Sandy Abraham's house.[9] Inside the house, Appellant sold some drugs to Sandy's cousin, Donald Lee Thomas, Sr. Sharon testified that Appellant was happy and excited—a little more talkative than usual. They left Sandy's house at about 1:00 a.m. and went to Appellant's mother's house where they smoked crack until 4:00 a.m. The went to bed around 4:30 a.m. and when she woke at about 8:00 a.m., Appellant was gone. Appellant came back shortly thereafter and told her that Russell Milton had been shot and killed. Sharon testified that a couple of days later, Appellant told her that he killed Russell.

## PROPOSITIONS

■ ¶ 9 Appellant complains in his first proposition that the evidence presented at trial was insufficient to support his conviction for First Degree Murder. He correctly asserts that the State presented no direct evidence outside of his statements connecting him to the murder of Russell Milton. He alleges that the evidence most heavily relied upon by the State to secure his conviction was the statement he allegedly made to Sharon Roberson that he killed Milton and his statement to the police that Sharon and Munkin killed Milton during a robbery in which he participated by driving the getaway car. He asserts that neither statement is sufficient to support his conviction because his statement to Sharon was uncorroborated and his statement to the police was both uncorroborated and rendered untrustworthy by its inconsistency.

■ ¶ 10 The test to be applied in determining the sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential

---

**6.** The blue ski mask Appellant claimed was used in the robbery was later recovered from the tan Lincoln that he drove.

**7.** This statement was later proven false as the car stolen from Bartlett Hospital had actually been recovered by the police and was in the custody of the police at the time that the homicide occurred.

**8.** The house was padlocked on the outside when Milton's body was discovered.

**9.** Sandy Abraham testified that while Appellant and Sharon were talking to each other at his house Appellant pulled out a stack of neatly folded bills which was about one to one and a half inches thick.

elements of the crime charged beyond a reasonable doubt. *Spuehler v. State,* 1985 OK CR 132, 709 P.2d 202. Further, the jury is the exclusive judge of the weight and credibility of the evidence and despite conflicts in the evidence, this Court will not disturb the jury's verdict if there is competent evidence to support it. *Smith v. State,* 1996 OK CR 50, ¶ 23, 932 P.2d 521, 530, *cert. denied,* 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997).

■■■ ¶ 11 Appellant correctly maintains that the State is required to prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [the accused] is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). He further contends that when a statement of an accused is used as sole proof of an element of an offense, corroboration is required. Appellant cites to *Smith v. United States,* 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954), for its holding that a conviction may not be based solely upon an accused's extrajudicial uncorroborated confession and all elements of the offense must be established by independent evidence or corroborated admissions. However, the accused in *Smith* was charged with tax evasion, a crime in which the identity of the accused was inseparable from proving the existence of the crime. The Supreme Court subsequently clarified the application of this ruling to cases such as the one in the present case, where proof of the existence of the crime was entirely separate from proof of the identity of the accused. In *Wong Sun v. United States,* 371 U.S. 471, 489 n. 15, 83 S.Ct. 407, 418 n. 15, 9 L.Ed.2d 441 (1963) (citations omitted), the Supreme Court held that:

> Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. There need in such a case be no link, outside the confession, between the injury

and the accused who admits having inflicted it.

¶ 12 This rule was followed by Tenth Circuit Court of Appeals in a first degree murder case where the defendant gave numerous and conflicting confessions. *See United States v. Treas–Wilson,* 3 F.3d 1406, 1409 (10th Cir.1993), *cert. denied,* 510 U.S. 1064, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994)(the dead body and manner of death supported the conclusion that the victim's death was the result of criminal conduct, thereby establishing trustworthiness of the defendant's confessions). *See also United States v. Wiseman,* 172 F.3d 1196, 1213 (10th Cir.), *cert. denied,* 528 U.S. 889, 120 S.Ct. 211, 145 L.Ed.2d 177 (1999)(court affirmed two robbery convictions although store employees could not identify the accused who had confessed to the robberies). This federal case law indicates that while, in a case such as this, there must be evidence independent of the accused's confession to establish the *corpus delicti* or the fact that a crime occurred and that some person was criminally culpable, it need not show any link, outside the confession, between the crime and the accused who admits to having committed it. Further, the independent facts establishing that Milton was killed and that his death was the result of criminal conduct also provide the requisite trustworthiness of the accused's confession. *Treas–Wilson,* 3 F.3d at 1409.

¶ 13 In accordance with this body of law, we find that despite an absence of corroborative evidence identifying him as the killer or a participant in the commission of this crime, Appellant's statements alone were sufficient to prove that he caused the death of Russell Milton, either with malice aforethought or during the commission of a robbery with a dangerous weapon. We also find that there was independent evidence supporting each of the elements of robbery with a dangerous weapon, the underlying felony to the felony murder alternative. When the evidence is viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Thus, Appellant's conviction need not be reversed with instructions to dismiss.

¶ 14 Appellant complains in his second proposition that the trial court erred by failing to sequester the jury three times during the course of the proceedings. The first instance occurred during the first stage of trial after the trial court read the instructions to the jury but before the parties gave their closing arguments. Defense counsel requested that the jury be sequestered and in response, the trial court reprimanded defense counsel for making "petty objections," overruled the request and recessed for the evening allowing the jurors to go home. While sequestration before submission of the cause is provided for by statute, 22 O.S.2001, § 853, the decision whether or not to sequester the jury prior to the time that the cause is submitted is within the discretion of the trial court. *See Collums v. State*, 1985 OK CR 20, ¶ 13, 695 P.2d 872, 875. This Court will grant relief on this alleged error only upon the defendant's showing, by clear and convincing evidence, that the jurors were prejudiced by exposure to specific improper influences by the failure to sequester. *See Neill v. State*, 1994 OK CR 69, ¶ 32, 896 P.2d 537, 550, *cert. denied*, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996). *See also Malone v. State*, 1994 OK CR 43, ¶ 4, 876 P.2d 707, 711. As Appellant has made no such showing relief is not required.

¶ 15 The third instance occurred when, during second stage after the instructions had been read and the closing arguments made, the trial court allowed the jury to separate for approximately ten minutes before beginning their deliberations. As defense counsel did not object to this separation all but plain error is waived. *See Wackerly v. State*, 2000 OK CR 15, ¶ 18, 12 P.3d 1, 10, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001). *See also Day v. State*, 1989 OK CR 83, ¶ 15, 784 P.2d 79, 84; *Elliott v. State*, 1988 OK CR 81, ¶ 15, 753 P.2d 920, 922. Finding no plain error, this allegation requires no relief.

¶ 16 The second complained of instance occurred when, after first stage instructions had been given and closing arguments had been made, the trial court, over defense objection, allowed the jury to leave the courthouse for a one hour and fifteen minute lunch recess. This allegation of error is compelling and is, as the State concedes, more problematic than the other two. Defense counsel complained at trial and it is argued again on appeal that sequestration was required at this time under title 22 O.S. 2001, § 857. This statute provides:

> After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court.

¶ 17 This statute, or a comparable version of it, has been on the books in Oklahoma since 1890. It is a well established part of this State's jurisprudence and even the earliest cases found it to mandate that a jury be kept together between the time the cause is submitted and the verdict returned. *See Bilton v. Territory*, 1909 OK CR 12, 99 P. 163, 1 Okl.Cr. 566; *Sample v. State*, 1910 OK CR 31, 106 P. 557, 3 Okl.Cr. 430. For almost a century, this Court's treatment of this statute has remained consistent, perhaps because neither its language nor its intent is ambiguous.

¶ 18 Under the plain language of section 857, after the jury has heard the charge, they are to remain together for deliberation until a verdict is returned. If they do not decide in court they must immediately retire for deliberations after having been put in the charge of an officer sworn to keep them together and away from outside communications. The only portion of section 857 legitimately subject to interpretation has been the point at which the jury is considered to have heard "the charge." This issue was addressed in the early case of *Evans v. State*, 1924 OK CR, 221 P. 794, 26 Okla.Crim. 9, *overruled in part on other grounds by Neill v. State*, 1994 OK CR 69, 896 P.2d 537. In *Evans*, after the jury had been instructed and had heard closing arguments, the trial

court declined defense counsel's request for sequestration and allowed the jury to separate and go home for the night. This Court found that the trial court's decision was error under the statute, holding that "as a matter of law ... the 'submission of the cause to the jury' occurs at the close of the argument." *Evans*, 221 P. at 796. The Court reasoned:

> In principle, we can see little difference between a separation of the jury after hearing the charge and argument of counsel, and a separation after the actual retirement of the jury for deliberation.
>
> The plain purpose and intent of the law is to surround a trial by such safeguards as will exclude all external and improper influence from the jury, and thus protect the right of a defendant to a fair and impartial trial.

*Id*, at 797.

¶ 19 Both the Court's holding and its underlying rationale have withstood the test of time. In *Page v. State*, 1958 OK CR 105, 332 P.2d 693, a case which presented a situation identical to that now before us, the jury was allowed to separate, over defense objection, and go to lunch after all evidence had been presented, the instructions read to the jury and closing arguments made. This Court reversed, finding that the mandates of section 857 had been violated since the case had been submitted to the jury at the close of instructions and arguments and the State had not overcome the presumption of prejudice. *Page*, 1958 OK CR 105, at ¶¶ 4–5, 332 P.2d at 695–96. Before doing so, it reiterated the importance of "guarding trials by juries from improper influences, and in compelling a vigilant observance of all the provisions of the Criminal Code tending to preserve the purity of such trials." *Id*, 1958 OK CR 105, at ¶ 4, 332 P.2d at 695, *quoting Evans*, 221 P. at 797. While we have not, until now, addressed another factually identical situation, we have not departed from the holding of these early cases. *See Mooney v. State*, 1999 OK CR 34, ¶ 63, 990 P.2d 875, 892; *McCormick v. State*, 1993 OK CR 6, ¶ 35, 845 P.2d 896, 902; *Bayliss v. State*, 1990 OK CR 51, ¶¶ 3–8, 795 P.2d 1079, 1080–81; *Tomlinson v. State*, 1976 OK CR 206, ¶ 26, 554 P.2d 798, 803.

¶ 20 Section 857 is an important statutory provision "designed to preserve inviolate the right to, and the purity of jury trials," *see Green v. State*, 1957 OK CR 116, ¶ 26, 319 P.2d 321, 328, and we continue to find its language to be mandatory. *Queen v. State*, 1972 OK CR 110, ¶ 2, 497 P.2d 441, 442. Thus, when a violation of this statute occurs over defense objection prejudice is presumed and the burden falls to the State to prove otherwise. *See Wackerly*, 2000 OK CR 15, at ¶ 18, 12 P.3d at 10. *See also Mooney*, 1999 OK CR 34, at ¶ 63, 990 P.2d at 892; *Jackson v. State*, 1987 OK CR 168, ¶ 10, 741 P.2d 875, 876; *Ford v. State*, 1958 OK CR 82, ¶ 4, 330 P.2d 214, 216.

¶ 21 The State attempts to overcome the presumption of prejudice by pointing to the admonishments given the jury by the trial court during the course of the trial. The State asserts that this Court can find these admonishments sufficient to overcome the presumption of prejudice as it did in *Jackson*, 1987 OK CR 168, at ¶ 11, 741 P.2d at 876, where it was found "significant that the trial court sternly admonished the jury as to the seriousness and importance of their duty before allowing them to separate." The *Jackson* Court further noted that the trial judge admonished the jury nine times not to discuss the case with anyone. *Id.* Appellant responds that the *Jackson* case is an aberration as it deviated from previously established jurisprudence of this Court and has not been cited for this proposition in any of this Court's subsequent published cases dealing with this issue. Appellant is correct. The State's argument is unpersuasive as the admonishments made by the trial court to the jury during the course of the trial and especially the minimal admonishment made before the jury was improperly allowed to separate cannot be found to overcome the presumption of prejudice caused by the trial court's failure to sequester the jury.

¶ 22 The State also argues that should this Court find that it failed to overcome the presumption of prejudice, the case should be remanded to the district court for an evidentiary hearing to investigate this issue under Rule 3.11(A), *Rules of the Court of Criminal Appeals*, Title 22, Ch.18, App. (2003). While

this Court has never before remanded for an evidentiary hearing in a situation such as the one in the present case, the State directs our attention to cases in which we have done so on other issues.[10] The State's request is not accompanied by supporting affidavits nor has it indicated that the questioning of every juror is possible or even that each of the jurors is still alive and can be located. The State has provided neither sufficient information supporting its request nor adequate reason why this case should be treated differently than the like cases which have preceded it.

¶ 23 Finally, pursuant to discussion at oral argument, we address the argument that this Court should reject the significant body of established law regarding section 857 and find that the jury is not required to be sequestered after hearing the charge but rather after the bailiff has been sworn to keep them together. Such argument is unpersuasive as it neither follows the plain language of the statute nor serves its intent. After the jury has heard the evidence, instructions and argument they have been provided all the tools they need to decide the case. Once the jury has heard the charge, under the dictates of section 857, it becomes imperative that they remain together away from outside communications and influences. The requirement that the bailiff be sworn to keep the jurors together is not the event which triggers the need for sequestration but rather is part of the procedure mandated to insure that the substantive requirements of the statute are followed. Thus, the fact that the bailiff in the present case was not immediately sworn to keep the jury together after they had heard the charge does not eliminate the error but rather compounds it.

¶ 24 While 22 O.S.2001, § 857 may, at times, place a burden on the trial courts, it is a burden which has been skillfully managed by the trial judges of this state for over a hundred years. As noted above, the statutory requirement of sequestering jurors after they have heard the charge serves the vital purpose of protecting the purity of jury trials in return for the additional resources it sometimes requires and we will not alter a century of sound law in the interest of judicial economy. Unfortunately, the trial court in this case abused its discretion in failing to grant defense counsel's request for sequestration and the State has failed to overcome the resulting presumption of prejudice. This error requires reversal.

¶ 25 Error complained of in proposition seven merits brief comment so that it may be avoided on retrial. In this proposition, Appellant argues that the prosecutor misstated the law by telling the jury that prison population is not 'society.' This comment was met with timely objection which the trial court improperly overruled. It is well established that for purposes of continuing threat, the word 'society' encompasses society in general, inside and outside of prison, and to tell the jury otherwise is error. See McElmurry v. State, 2002 OK CR 40, ¶ 149, 60 P.3d 4, 34. See also McCarty v. State, 1998 OK CR 61, ¶ 92, 977 P.2d 1116, 1137, cert. denied, 528 U.S. 1009, 120 S.Ct. 509, 145 L.Ed.2d 394 (1999)(the term "society" refers to society as a whole).

¶ 26 The Judgment and Sentence of the trial court is **REVERSED** and **REMANDED** to the district court for a **NEW TRIAL.**

JOHNSON, P.J. and CHAPEL, J.: concur.

LUMPKIN, J.: concur in part/dissent in part.

LILE, V.P.J.: dissent.

LILE, Vice Presiding Judge: Dissents.

¶ 1 This jury was allowed to separate following the court's instructions and prior to closing arguments in the guilt stage, over the objection of the defendant. The trial court's determination on sequestration at that point is entirely discretionary under 22 O.S.2001,

**10.** In Van White v. State, 1999 OK CR 10, ¶ 25, 990 P.2d 253, 263–64, this Court remanded the case to the district court for an evidentiary hearing to determine whether the prosecutor had a race-neutral reason for excusing a black juror and in Young v. State, 2000 OK CR 17, ¶¶ 104–

05, 12 P.3d 20, 47, cert. denied, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001), this Court remanded the case to the district court for an evidentiary hearing to determine whether some of the jurors had used a Bible during deliberations.

§ 853. No facts are asserted to establish that this failure to sequester was an abuse of discretion. There is no claim that anything improper occurred to influence the jury. There is no claim that this is the type of case where public feeling or news coverage would require sequestration.

¶ 2 The jury was again allowed to separate after instructions and after closing arguments in the punishment stage. No one objected. We have repeatedly held that under these circumstances any error is waived. *Wackerly v. State*, 2000 OK CR 15, 12 P.3d 1, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001). Again, there is no claim that anything improper happened with the jury. There is no claim that any prejudice arose from these separations.

¶ 3 In the course of a trial, the jury will be allowed to separate many times. These common rest breaks during the day, night recesses and other separations are preceded by repeated admonishments to the jury not to discuss the case among themselves or with others. The admonishments work successfully in thousands of trials. Only very rarely are these admonishments inadequate. Only very rarely does something happen to breach the sanctity of the jury.

¶ 4 In this particular case, there is not even an allegation that anything improper happened and certainly no evidence that the jury was subjected to any improper influence. So, why must this case be retried; why does the Court require such a drastic remedy when nothing went wrong with the trial.

¶ 5 The trial court allowed the jury to go eat lunch after first stage closing argument and before being sequestered for deliberations. No one asserts that there were any improper influences upon the jury. Admonishments which worked throughout the trial are suddenly deemed inadequate to protect the jury during lunch ·and a later identical separation is no problem for this Court. There is no sound reason for this reversal.

It is upon the most technical of grounds and ordered in the absence of even a hint of any prejudice. Any error here lies not with the trial court but with this Court.

LUMPKIN, J.: Concur in part/dissent in part.

¶ 1 I agree that if the Court applies our prior decisions without asking the underlying question regarding what is the purpose of the provisions of 22 O.S.2001, § 857, then *stare decisis* would dictate the result reached in this case. However, I would like to submit a deeper analysis of the statutory language in conjunction with the realities of the trial of a criminal case in the District Court of Oklahoma, and propose a more supportable statutory interpretation.

¶ 2 First, we must recognize the question presented is not one of constitutional magnitude, either federal or state. It is the proper application of a state statute. In fact, it is a common practice in federal and other state jurisdictions for jurors to be allowed to separate even during the course of deliberations. *See U.S. v. Eldred*, 588 F.2d 746, 752 (9th Cir.1978); *U.S. v. Phillips*, 540 F.2d 319, 332 (8th Cir.1976); *U.S. v. Palacio*, 477 F.2d 560, 561 (5th Cir.1973); *People v. Austin*, 185 Colo. 229, 523 P.2d 989, 993 (1974); *State v. Bynum*, 282 N.C. 552, 193 S.E.2d 725, 729 (1973); *State v. Atwood*, 83 N.M. 416, 492 P.2d 1279, 1284 (N.M.App.1971); *Bryant v. State*, 246 Ind. 17, 202 N.E.2d 161, 163–64 (1964); *People v. Nick*, 360 Mich. 219, 103 N.W.2d 435, 437–38 (1960).[1]

¶ 3 Second, as a matter of law, we presume jurors follow the instructions given to them during the course of the trial. *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993), *United States v. Carter*, 973 F.2d 1509, 1513 (10th.Cir.1992), *cert. denied*, 507 U.S. 922, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993); *Turrentine v. State*, 965 P.2d 955, 968 (Okl.Cr.), *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142

---

1. In fact, there are a total of forty-four (44) states that follow this majority view. While Oklahoma is one of only six (6) states that adhere to the minority position that does not allow separation during deliberations, I acknowledge this has no impact on the language of Section 857, however, it should at least bring into question the application of presumed prejudice upon violation of the statute.

L.Ed.2d 562 (1998), *Jones v. State,* 764 P.2d 914, 917 (Okl.Cr.1988).

¶ 4 As the opinion points out, the trial judge in this case repeatedly admonished the jurors not to discuss the case, consider matters other than evidence presented in the courtroom, and not to begin deliberations until the case was finally submitted to them. More importantly, Instruction No. 37, the final instruction in the guilt stage written jury instructions, directed the jurors as follows:

> After you have retired to consider your verdict, select one of your number as foreperson and enter upon your deliberations. When you have agreed on a verdict, your foreperson alone will sign it, and you will, as a body, return it in open court. Your verdict must be unanimous. Forms of verdict will be furnished. You will now listen to the argument of counsel which is a proper part of this trial.

¶ 5 This is Oklahoma Uniform Jury Instruction–Criminal 10–10, General Closing Charge—Closing Instruction. In 1958, when *Page v. State,* 332 P.2d 693 (Okl.Cr.1958) was decided, judges did not have the benefit of these uniform instructions. In fact, it was not until 1981 that the first uniform instructions were adopted.[2] Prior to that time there was no uniformity. Why does that make a difference as we address the issues presented in this case? Today, every juror in a criminal case in Oklahoma knows that deliberations are not to commence until they have been removed to the jury room and selected their foreperson. The sole purpose of Section 857 is to ensure the sanctity of the deliberations of the jury. If, by the instructions given by the Court, those deliberations cannot begin until they have retired and selected a foreperson, then there can be no prejudice.

¶ 6 Third, anyone who has ever tried a criminal case realizes there is a certain sequence of events at the conclusion of the trial whereby the jury is committed into the custody of the bailiff to ensure the provisions of Section 857 are enforced. When the case is to be finally submitted to the jury for deliberation, the bailiff is brought forward and the judge administers an oath, an acknowledgment of which places the jury into the bailiff's custody for movement to the jury room to begin their work. It is clear to everyone by this procedure when the deliberations begin. However, it is not uncommon in the courtrooms of this state, prior to the bailiff taking the oath, for judges to allow restroom breaks, and time for Court reporters to ensure all the exhibits admitted into evidence are delivered to the jury room and time for other necessary administrative matters to be addressed. These are the realities of the everyday life of trials in the District Courts of Oklahoma. And, that is what was done in this case. Prior to the administration of the oath to the bailiff (Tr. Pg.1401), the jury was released to go to lunch, reminded of the prior admonitions, and advised the case would be submitted to them at 1:30 p.m. and they would be allowed to deliberate at that time. When they returned from lunch, the bailiff was sworn and the jury retired to begin deliberations.

¶ 7 I believe our statutes should be applied with a pragmatic understanding of how the trial courts must operate and a view toward what the statute is actually seeking to protect. Needless to say, today no one would expect a jury to reach a decision in the jury box, yet the statute says they can. If a judge tried to get them to come to a verdict in open court, this Court would certainly chastise the judge. Therefore, we all should be able to agree some common sense must be applied in the interpretation of these procedures.

¶ 8 Due to the fact the Uniform Jury Instructions, approved and adopted by this Court, now provide a uniform direction to juries throughout this state as to when the deliberative process begins, I submit the arbitrary and impractical time alluded to in *Page, et.al.,* should be overruled. Instead, this Court should recognize the actual practice in the District Courts of Oklahoma and hold that the provisions of Section 857 apply

**2.** *See* 12 O.S.Supp.1968, § 577.1 (authorizes Court of Criminal Appeals to adopt uniform jury instructions.)

upon the bailiff taking the oath and the trial judge remanding the jury to the custody of the bailiff to commence their deliberations in the case. This fulfills both the legislative intent and preserves the sanctity of the jury deliberations. Applying this more tenable interpretation, and one that will not only be accepted but respected by lawyers and lay persons alike, I would find no prejudice has been shown and affirm the judgment and sentence in this case. For these reasons, I respectfully dissent to the Court's decision to reverse and remand this case for a new trial.